PHILIP J. LEVIN, PLAINTIFF-APPELLANT, AND BRIDGE-WATER LEASING CORP., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. TOWNSHIP COMMITTEE OF THE TOWNSHIP OF BRIDGEWATER AND PLANNING BOARD OF THE TOWNSHIP OF BRIDGEWATER, DEFENDANTS-RESPONDENTS.

Argued December 21 and 22, 1970—Decided February 22, 1971.

508

*Mr. Clive S. Cummis* argued the cause for appellant Bridgewater Leasing Corp. (*Mr. David S. Litwin* on the brief; *Messrs. Cummis, Kent & Radin,* attorneys).

*Mr. William E. Ozzard* argued the cause for appellant Philip J. Levin (*Messrs. Beekman, Ozzard, Mauro & Savo,* attorneys).

*Mr. Richard H. Thiele, Jr.* argued the cause for respondent Township Committee of the Township of Bridgewater (*Mr. Louis A. Imfeld* on the brief; *Messrs. Wharton, Stewart & Davis,* attorneys).

*Mr. Charles A. Reid, Jr.* argued the cause for respondent Planning Board of the Township of Bridgewater.

The opinion of the Court was delivered by

FRANCIS, J. In this action, plaintiffs Philip J. Levin and Bridgewater Leasing Corp. seek to invalidate a declaration that a certain land area in Bridgewater Township, Somerset County, is "blighted" under *N. J. S. A.* 40:55–21.1(e). After investigation and hearings, the Township Planning Board resolved that the area was blighted, and thereafter the Township Committee approved that resolution. Plaintiffs then proceeded by complaint in lieu of prerogative writ in the Superior Court, Law Division and, following an adverse result there, sought further review in the Appellate Division.

We granted the Township Committee's petition for certification before argument there.

The declaration of blight was made under subsection (e) of *N. J. S. A.* 40:55–21.1. Section 21.1(a) through (e) contains five separate definitions of "blighted area." If the condition of the land involved meets the specifications of any one of the five subsections the finding of blight is unassailable. *Wilson v. Long Branch*, 27 *N. J.* 360, 392, *cert. den.* 358 *U. S.* 873, 79 *S. Ct.* 113, 3 *L. Ed.* 2d 104 (1958). Subsection (e) provides that an area is blighted where there exists:

A growing or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein and other conditions, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare.

Since the subsection seems to have been rarely used or referred to in judicial decisions, it seems worthwhile to look into its legislative origins. *Cf. Jersey City Chapter of the Property Owner's Protective Assoc. v. City Council of Jersey City*, 55 *N. J.* 86 (1969). The Blighted Area Act was adopted originally by *L.* 1949, *c.* 187, *N. J. S. A.* 40:55–21.1 *et seq.* At that time, subsection (e) was not included. In the same session of the Legislature the Local Housing Authorities Law was amended by *L.* 1949, *c.* 300, *N. J. S. A.* 55:14A–31 *et seq.* That amendment contained a legislative declaration regarding blighted areas to the effect that

there are also *certain areas where the condition of the title, the diverse ownership of the land to be assembled, the street or lot layouts, or other conditions prevent a proper development of the land, and* that it is in the public interest that such areas, as well as blighted areas, be acquired by eminent domain and made available for sound and wholesome development in accordance with a redevelopment plan, and that the exercise of the power of eminent domain and the financing of the acquisition and preparation of land by a public agency for such redevelopment is likewise a public use and purpose; * * *. (Emphasis added.) *N. J. S. A.* 55:14A–31(d).

This declaration was implemented by including in the definition of blighted area set out in that statute (*N. J. S. A.* 55:14A–32(e)) the precise language which is involved in this case and which, as will be noted, was added later to the 1949 Blighted Area Act, *supra*. Moreover, the Redevelopment Agencies Law, also adopted in 1949, *L.* 1949, *c.* 306 (*N. J. S. A.* 40:55C–1 *et seq.*) included the same subsection (e) in its definition of blighted area. *N. J. S. A.* 40:55C–3 (e). That statute likewise contained a legislative determination on which subsection (e) was undoubtedly based. It said that blighted areas or areas in the process of becoming blighted existed in the State "* * * by reason of inadequate planning of the area, or excessive land coverage, * * * or deleterious land use, * * * or the unsound subdivision plotting and street and road mapping, or obsolete layout, or a combination of these factors * * *." Further it declared that "* * * redevelopment of such areas will promote the public health, safety, morals and welfare, *stimulate the proper growth of urban, suburban and rural areas* of the State, preserve existing values and maintain taxable values of properties within or contiguous to such areas, and encourage the sound growth of communities." (Emphasis added.) *N. J. S. A.* 40:55C–2. The lack of a subsection (e) definition in the Blighted Area Act was discovered later and it was added by *L.* 1951, *c.* 248. The statement attached said:

The purpose of this bill is to make uniform the definition of "blighted area" as given in the act which this bill amends, in the local housing authorities law (*P. L.* 1949, *c.* 300), and in the redevelopment agencies law (*P. L.* 1949, *c.* 306). *R. S. Cum. Supp.* 40:55–21.1 (1951).

■■ It may be noted from the above that the legislative purpose in enacting the related 1949 statutes was not solely to provide for slum clearance. It was to authorize the public agencies to function for slum clearance and urban, suburban and rural redevelopment, to acquire land for that pur-

pose and to make it available for redevelopment by private enterprise or by public agencies in accordance with approved redevelopment plans. Another purpose was to authorize cooperation with and the obtaining of funds from federal agencies. Obviously these enactments are *in pari materia* and warrant liberal judicial construction in order to effectuate the beneficent legislative design. See *e. g., N. J. S. A.* 40:55C–29. An important aspect of that policy, as indicated by the common inclusion of subsection (e) in all three statutes, as well as the legislative determinations quoted above. is that the lawmakers intended that land areas should be deemed blighted and made available for redevelopment when from the community standpoint *"proper development"* thereof was being prevented or impeded by title problems, diverse ownership, obsolete and impractical street and lot layouts and the like, any of which have resulted in a stagnant and unproductive condition of the land.

Although the Federal Housing Act of 1949 (Act July 15, 1949, *c.* 338) is not involved in the present situation, some of its provisions obviously have influenced the pattern of the New Jersey legislation. The Federal Act was adopted to remedy problems of shortages in available housing and to provide federal assistance for the assembly and clearance of areas which would be redeveloped primarily for residential uses. See Legislative History, 1949 *U. S. Code Cong. Service* 1550, 1563.

The 1949 Act authorized as a redevelopment project "(iii) land which is predominantly open and which because of obsolete platting, diversity of ownership, deterioration of structures or of site improvements, or otherwise substantially impairs or arrests the sound growth of the community * * * or (iv) open land necessary for sound community growth * * *." Act July 15, 1949, *c.* 338, § 110. *Now* 42 *U. S. C. A.* § 1460(c) (1) (ii), (iii) (1964). Although the Act, as initially passed, required that such land be redeveloped for "predominantly residential uses," subsequent amendments have provided that, if the local governing body determines

that redevelopment of such an area for predominantly non-residential uses is "necessary and appropriate to facilitate the proper growth and development of the community in accordance with sound planning standards and local community objectives and to afford maximum opportunity for the redevelopment of the project area by private enterprise," certain federal financial aid may be extended. 42 *U. S. C. A.* § 1460(c), p. 146 (1964) ; 42 *U. S. C. A.* § 1460(c), *p.* 145 (1964) ; Housing Amendments of 1955, Act Aug. 11, 1955, *c.* 783; Housing Act of 1959, *Pub. L.* No. 86–372, § 413; and see *Blachman v. Erieview Corp.,* 205 *F. Supp.* 797 (Ohio D. C., *aff'd* 311 *F.* 2d 85 (6 Cir. 1962), *cert. den.* 372 *U. S.* 941, 83 *S. Ct.* 934, 9 *L. Ed.* 2d 967 (1963).[1]

For an additional perspective of the New Jersey approach to problems of redevelopment, the legislative movement on the national scene may be contrasted. It has been said that the federal movement "suggests two predominant trends: (1) the expansion of the physical area of concern, and (2) emphasis on raising the level of efficiency in the functioning

---

[1]The New Jersey definition of blighted area contained in subsection (e), *N. J. S. A.* 40 :55–21.1, is not peculiar to our State. Similar and in some instances identical provisions appear in the statutes of other states. For example in Maine the act says:

If undeveloped vacant land is to be developed for nonresidential uses, the municipal officers shall determine that such nonresidential uses are necessary and appropriate to facilitate the proper growth and development of the community in accordance with sound planning standards and local community objectives, which acquisition may require the exercise of governmental action * * * because of defective or unusual conditions of title, diversity of ownership, tax delinquency, improper subdivisions, outmoded street patterns, deterioration of site, economic disuse, unsuitable topography or faulty lot layouts * * * or any combination of such factors or other conditions which retard development of the area. 30 *M. R. S. A.* § 4808 (1964).

See also:

California. *H. & S. C. A.* § 33030–33038 (supp. 1970).

Delaware. 31 *Del. C.* § 4501 (supp. 1968). *Slum Clearance and Redevelopment Authority Law,* 48 *Del. Law,* ch. 345.

Georgia. *Ga. Code Ann.* § 99–1201a, 1203a(2) (1967). *Redevelopment Law,* Acts 1946, pp. 157, 158.

of the urban mechanism. The scope of renewal has germinated from the 'individual' emphasis of 1934, to the 'project' emphasis of 1937 and 1949, to the 'neighborhood' in the 1956 Act, to the 'community' in 1959 and finally to 'entire urban areas.' " Comment, The Concept and Objectives of Urban Renewal, 37 *S. Cal. L. Rev.* 55 (1964). On the other hand, in our State, from the very beginning of the efforts to deal with the problem of blight, the vista has been a broad and comprehensive one. The Legislature revealed as its clear purpose not only the clearance, replanning, development or redevelopment of urban blight, but suburban and rural blight as well. See *Wilson v. Long Branch, supra,* 27 *N. J.* at 370.

There is no reported case in our State applying subsection (e) to a sizeable rural or suburban land area as a basis for a blight determination. However, it is plain from a reading of (e) that the land involved does not have to be a slum area. This Court has said that the statute "goes far beyond the elimination of the perceptually offensive slums"; also that an area does not have to be a slum to make its redevelopment a public use nor is public use negated by a plan to turn a predominantly vacant, poorly developed area into a site for commercial structures. *Jersey City Chapter of the*

---

Illinois. *S. H. A. ch.* 67½, § 64, 65 (supp. 1971). *Blighted Areas Redevelopment Act of 1947,* L. 1947, p. 1072, § 1 *et seq.*

Massachusetts. *Mass Ann. Laws ch.* 121A, § 1, 2 (1965), *ch.* 121B, § 1, 45 (supp. 1969).

Minnesota. *M. S. A.* § 462.421(11), (13) (supp. 1970). *Municipal Housing and Redevelopment Act,* L. 1947, c. 487.

Pennsylvania, 35 *P. S.* § 1701, 1702 (1964). *Urban Redevelopment Law,* 1945, May 24, *P. L.* 991.

Rhode Island. *R. I. Gen. Laws* § 45–31–1, 45–31–8 (supp. 1968). *Redevelopment Law of 1956, P. L.* 1956, *ch.* 3654.

Virginia, *Va. Code* § 36–48 (1970). *Redevelopment Projects Act,* L. 1946, p. 278. Section 49(3) authorizes acquisition of real property "where the condition of the title, the diverse ownership of the real property to be assembled, the streets or lot layouts, or other conditions prevent a proper development of the property and where the acquisition of the area by the authority is necessary to carry out a redevelopment plan."

*Property Owner's Protective Assoc. v. City Council of Jersey City, supra,* 55 *N. J.* at 97–98. In the last analysis, the statute's construction and application must "turn on the breadth of the objectives of the legislation and the commonsense of the situation." *Id.* at 100. Sensibly then it must be said that the Legislature intended by means of (e) to encourage the proper and sound growth of suburban and rural land, particularly open areas which because of the conditions described therein were stagnant and unproductive but which, in the judgment of the municipal authorities, were potentially useful and valuable.

All the New Jersey statutes referred to above. which as we have said are *in pari materia,* show a purpose to make possible a comprehensive, coordinated and scientific approach to eliminate the conditions retarding public use and to develop or redevelop the area involved in a unified and integrated manner. The lawmakers recognized that where an undeveloped land area was burdened with defective, questionable or unusual conditions of title, unsuitable lot layouts, diverse ownership, and outmoded and undeveloped street patterns, serious difficulties stood in the way of a unified development which would serve the health, welfare, social and economic interests, and sound growth of the community. They knew that fractionalization could be eliminated and the area dealt with as a whole if it could be treated as blighted and if the municipal power of eminent domain could be exercised to expeditiously bring it into such ownership as would permit realization of its maximum potential as part of an orderly community growth. The conclusion is inescapable that subsection (e) was added to the blighted area statute in order to make such a result possible.

The foregoing discussion brings us to the critical issue, *i. e.,* whether the land area in question was properly the subject of a declaration of blight under subsection (e) of the statute.

The area involved as described by Lindbloom, the Township's planning expert, is roughly triangular in shape and

encompasses approximately 120 acres. For reasons to be mentioned later it was dubbed the "Golden Triangle" (Triangle). It is bounded on the west by Routes 202 and 206, on the north by Eighth Avenue and Interstate Route 287, on the east by North Bridge Street and on the south by Route 22 and Cloverleaf Drive. Block 4488 on the municipality map, in the most southeasterly portion of the area, contains the Somerville Inn, Elks Club property and a gasoline station. That block was not included in the blight declaration.

With the exception of Block 4463 which contains about 17 acres located in the extreme southwest portion of the area bordering on Cloverleaf Drive and which is now owned by the plaintiffs in this action, the entire blighted area is within a larger tract know as "Floral Park."

The Triangle has sparse vegetation, adequate surface drainage and a water table usually more than 10 feet below the surface. It contains 18 or 19 dwelling structures all of which were built prior to 1959 and most of which are situated on the periphery of the area where there is road frontage. Nine of these structures are located within Block 4463 of which plaintiffs assert ownership; the others are scattered throughout the Triangle. A few advertising signs and minor outbuildings are the only other existing structures. The vast majority of the land in the Triangle is undeveloped; a small portion is devoted to agricultural use. Despite the platted streets shown throughout the area on the maps, the only streets which actually exist are Sixth Street which is paved and a part of Lenox Avenue and Shasta Drive which are unimproved. The remainder are "paper streets." According to the report of plaintiffs' planning and urban renewal consultant, Isadore Candeub, of the total of approximately 25,350 feet of platted street length within the Triangle, only 4120 feet or 16% of the total is presently in use. The area is not served by sewers; water lines abut it on North Bridge Street; gas lines run across the area on Sixth Avenue and abut it on Routes 202–206.

Presently the area is zoned C–2, "Regional Business" and requires a minimum lot size of 10 acres. The primary uses permitted in the zone are "regionally oriented retail shopping centers" or malls and the customary accessory uses. Also authorized for the zone by special permit from the Board of Adjustment are hotels or motels, hospitals, public utility installations, schools and quasi-public uses. All of the experts in the case seemed to agree that the highest and best use for the property would be a large scale shopping center or mall. Two of the experts spoke of a center comparable to the Garden State Plaza and Bergen Mall at Paramus.

In 1911, Floral Park (which, as noted above, did not include Block 4463, title to which is now claimed by plaintiffs) was owned by Prudential Development Company. Prudential planned to develop the area as a residential suburb of Somerville and subdivided it into a gridiron pattern of small lots, blocks and streets. None of the major highways, Routes 22, 202 and 206, and 287, now circumscribing the area, existed at the time. Floral Park originally consisted of 1089 separate lots of 100′x100′ or 100′x40″ dimensions; portions of some of these lots were sold later, resulting in a number of 20′x100′ parcels. About 450 of these lots were located within the Triangle, and all but about 50 of these were conveyed by Prudential to other owners prior to 1935.

Although there were many transfers of title in the tract, very little residential development occurred. As indicated above, there are only 18 or 19 dwellings in the entire Triangle, 10 in the Floral Park area, and the other nine in Block 4463. Over the years, primarily through tax foreclosures, the Township acquired title to many of the lots. In the spring of 1968, when the blight hearings commenced, the tax records showed that the Township owned 268 of the 450 parcels in the Triangle. Thus by 1968 the Township owned more than 39% of the Triangle land and, with the 21.47% represented by the dedicated streets, controlled more than 60% of it. As will be noted later with more particularity, the validity of a number of these foreclosures

and of the Township's resulting title has been cast into doubt by a title examination which was completed while these proceedings were in progress. These Township holdings are scattered throughout the Triangle in every block but five. In addition, in April 1968, 29 parcels were listed on the municipal assessor's records as in "unknown" ownership.

In 1935, Prudential Development Company was dissolved. At that time, its trustees in dissolution gave an assignment of its interests in the remaining land to City Hall Land & Improvement Corporation. No deed was given and the assignment was not recorded until January 22, 1969, during the course of the present proceedings. On January 10, 1969, City Hall Land assigned its interests in the Triangle properties to Capital Property Associates (whose president, William Grimaldi, was associated with a developer interested in the Triangle). Capital claims title to whatever "property interests" were transferred by the assignment. Between the 1935 assignment from Prudential to City Hall Land and the 1969 assignment from City Hall Land to Capital Property Associates, the Prudential trustees in dissolution by two deeds recorded on March 6, 1963 had conveyed to the Township:

* * * all of the lands and premises in the Township of Bridgewater in the County of Somerset in the State of New Jersey not hereinbefore specifically described owned by Prudential Development Company on December 29, 1961 and all of the lands and premises in said Township in which the Prudential Development Company owned any interest and to the extent of such interest on December 29, 1961.

These various assignments and deeds create a dual claim of title to some 50 lots in the Triangle.

At the advent of the 1960s, the land in Floral Park had remained largely undeveloped and stagnant for many years. Routes 22, 202 and 206 and their interchange had been developed but with the development of Interstate Highway 287 in the early 1960s, the potential of the Triangle for commercial development thrust itself upon both the mu-

nicipality and developers. By 1964, its tremendous potential had brought to it the sobriquet "Golden Triangle" and developers set out to assemble land within it.

Although at this time much of the land had been acquired by the Township by way of tax foreclosures, many parcels were still privately owned. Two local developers succeeded in acquiring some contiguous parcels. Edward Chandler assembled nine parcels, aggregating approximately one acre in the extreme easterly portion of the Triangle; James Atria assembled 30 parcels, not all of them contiguous, comprising about five acres in the southerly portion of the Triangle fronting on Route 22. In July or August 1965, Milton Wollman, in association with William Grimaldi, through the Golden Triangle Corporation, began to accumulate parcels with the intention of developing a shopping center complex having Bamberger's or Macy's as a lead store. Ultimately, he acquired 14½ acres, largely in Block 4463, most of which, as noted above, had not been in the original Floral Park area and so had never been platted and subdivided as extensively as the Floral Park portion of the Triangle. Finally, plaintiff Philip J. Levin, a major shopping center developer, and Vornado, Inc., owner of Two Guys Stores (and the latter's subsidiaries, plaintiff Bridgewater·Leasing Corp. and Brick Stores, Inc.) combined by oral agreement in a joint venture allegedly to develop the entire Triangle; their main interest, however, was apparently the establishment of a Two Guys Store. By April 1968, Bridgewater Leasing had acquired five acres consisting of ten parcels mainly in Block 4463. As of December 1967, there were 55 private owners of parcels in the Triangle. Most of them (38) owned only one parcel; 12 owners held two to five parcels; and five owned nine or more parcels. In spite of what the trial court called "frenetic" efforts to assemble land parcels, and the tremendous increase in the sale price of acreage, in early 1968 according to the tax records, the property ownership appeared as follows:

| OWNERSHIP | ACRES | | PERCENT OF TOTAL |
|---|---|---|---|
| Streets | 26.21 | | 21.47 |
| Township Owned (exc. of lots claimed by Township but on assessment rolls) | 47.64 | | 39.03 |
| Private Owners: | 44.22 | | 36.23 |
| Wollman | | 14.48 | |
| Bridgewater Leasing | | 5.05 | |
| Atria | | 5.18 | . |
| Chandler | | 1.68 | |
| Elks | | 2.46 | |
| Other Owners | | 15.37 | |
| Unknown | 3.99 | | 3.27 |
| TOTALS | 122.06 | | 100% |

There is no doubt from the record that from the early 1960s the Township was acutely aware of the increasing potential of the Floral Park area for commercial development which was being created by the construction of Interstate Route 287. In September 1964, at a joint meeting of the Township Committee and the Planning Board, consideration was given to the possibility of an urban renewal project for the area. Appearing at that meeting were four planning consultants, including Isadore Candeub and Carl C. Lindbloom (a representative of Herbert Smith Associates) both of whom, as it turned out, testified later in this case.

Lindbloom suggested use of the municipal authority under the Blighted Area Act, *N. J. S. A.* 40:55-21.1, and particularly subsection (e) thereof, to assemble and develop the area. Candeub at that time concurred with Lindbloom's view but later testified to the contrary in behalf of the plaintiffs at the Law Division hearing although he did not appear as a witness before the Planning Board. At any rate, the minutes of the September 1964 meeting (which are in the record) reveal that Candeub suggested

* * * use of municipal powers of redevelopment under State Statutes, stating that would cost less than trying to get a grant from the Federal Government. He stated the area would not be eligible for a Federal grant, as it is not sufficiently blighted or developed enough. *He stated that under the State Statutes, in his opinion, it*

*would qualify as far as blight is concerned, and the township could acquire the remainder of the land.* He said it would be *a simple matter* for his concern to make a survey for eligibility *which would hold up the Courts,* and they then could develop a plan for the project area which would go to public hearing. By showing blight and a plan, the Township could secure the power of eminent domain to purchase properties which they have not been able to purchase. \* \* \* (Emphasis added.)

He said "his firm could do everything necessary for the township except appraisals and legal work; \* \* \*" and that the land "should be developed as a unit, and it could be broken up later." In his opinion, "acquisition of fringe areas" would be required, except the Elks Club property.

On September 25, 1964, two days after that meeting, Candeub wrote to the Chairman of the Planning Board summarizing his earlier comments, indicating his interest in the selection of his firm to handle the redevelopment project and attaching a "typical" form of his firm's employment contract. Among other things, Candeub wrote: "It is our opinion that the area is eligible as a 'blighted' area under state statutes," and "[w]e are therefore suggesting that you initiate a program to redevelop the land in accordance with the state requirements." Not having been chosen as planning consultant, he turned up in this action as a witness for the plaintiffs with a new view that the area was not blighted within the meaning of the State statute. The trial court declined to admit this letter in evidence because it was not produced until the end of the hearing and Candeub was not cross-examined about it. But he had been cross-examined about substantially the same oral statements which he had made at the earlier meeting before the Planning Board and Township Committee. Moreover, since plaintiffs charge in this case that both the Planning Board and the Township Committee acted in bad faith in declaring the Triangle blighted in September and October 1968 — four years after Candeub expressed his original opinion — we believe the letter should have been admitted on that issue at least. *Cf. Wilson v. Long Branch, supra,* 27 *N. J.* at 387.

During 1965–1966, the Township received at least two proposals for development of the Triangle. The Louis Schlesinger Company, acting for Vornado, Inc. (Two Guys), proposed a regional shopping center, industrial park and civic center to be developed privately. Among other things, the Company offered to

[A]dvise and assist the Planning Board and the Township Committee in the investigation of "blight" and the blighted area hearings required by state statutes and in all other procedures required for the consolidation and redevelopment of the project area.

At the request of the Planning Board, Smith Associates, its planning consultant, considered the matter and in the course of an elaborate and seemingly dispassionate review of the proposal, recommended further study. In October 1965, the Board rejected the Schlesinger Company proposal.

In early 1966, the Golden Triangle Development Corporation (Wollman and Grimaldi's corporation) proposed to buy Township owned land in the Triangle on such terms and conditions as the municipality might require. Wollman proposed establishment of a retail shopping center with a principal occupier being a Macy-Bamberger's type of operation. The Township was interested in this proposal and tentatively accepted the Wollman bid subject to a number of conditions it imposed. For example, it required a 10 acre tract ownership — as was set out in the zoning ordinance; also that "[t]he principal tenant of the * * * shopping center shall be a retail sales establishment of a quality and type equivalent to that of a standard Bamberger Branch department store." Explaining the conditions, the Mayor of Bridgewater at the time of the Wollman proposal, said the Township was "looking for a high type shopping center." He did not consider the Two Guys operation as having the same quality as a Macy-Bamberger's store. The conditions of sale, which were published as required by the sale of public lands statute, N. J. S. A. 40:60–26, and the fact that Wollman was the only owner of 10 acres of the Triangle at the

time, prompted plaintiffs to attack the proposed sale by a prerogative writ proceeding. Before hearing, the Township abandoned the effort to consummate a sale to Wollman's corporation.

It is worthy of note that following the termination of this litigation, counsel for one of the plaintiffs, in a friendly and cooperative fashion, wrote to the Township as an interested citizen saying that he joined in "wanting to see not only a substantial ratable brought in but also wanting it to be of a level and type that will make us all proud to have participated in its acquisition." The letter said also:

> You are aware that there are many out-parcels in the general area which could cause problems for any purchaser. You are also aware that some of the titles which allegedly belong to the Township are in question. It would seem to me that you might wisely exercise some of the powers vested in municipalities, such as in the field of urban renewal, which would permit you to acquire titles at fair prices and put together a total package with which you could approach all available bidders, but on your own terms and according to the best interests of the Township.

In October 1966, the Planning Board adopted a Master Plan, prepared by Smith Associates, which recommended that the most logical use of the Triangle would be a "major regional shopping center." In the consultants' view, "[s]uch a center would attract business from a very extensive trade area due to the outstanding access it would have to all elements of the regional highway system."

Thereafter, the Township engaged special counsel to furnish advice on how best to develop the Triangle as a regional shopping center. This resulted in a lengthy opinion letter of November 30, 1967 which, after a review of the situation, concluded that *N. J. S. A.* 40:55–21.1 offered an efficacious procedure for orderly and controlled development of the Triangle as a unit. The view was expressed that the diversity of ownership and the condition of titles qualified it as blighted under *N. J. S. A.* 40:55–21.1(e); also that the "blight" route would enable the Township to judge de-

velopers' proposals on the basis of community interest and not solely by the highest bid test.

On December 4, 1967, undoubtedly as the result of that legal opinion which was compatible with the views previously expressed by Lindbloom, Candeub, the Schlesinger Company and counsel for one of the present plaintiffs, the Township Committee, by resolution pursuant to *N. J. S. A.* 40 :55–21.2, instructed the Planning Board to make a preliminary investigation as to whether the Triangle was a blighted area under subsection 21.1 of the statute. In preparation for the public hearing required by subsection 21.4, the Planning Board commissioned Smith Associates to study and evaluate the area with respect to the existence of conditions warranting a declaration of blight. The study and evaluation were made under the supervision of Lindbloom; his report was completed in April 1968 and was thereafter submitted to the Planning Board which fixed June 12, 1968 as a public hearing date.

At the hearing, the Lindbloom report was submitted and orally summarized by the author. It was his opinion that the Triangle area was blighted within the meaning of subsection (e) of the statute. In his view,

> \* \* \* the total lack of proper utilization of this area is caused by a combination of factors previously enumerated including condition of title, diverse ownership and inadequate lot, block and street platting. The result has been the present stagnant and unproductive condition of a 122 acre area that, because of its location, has a regional development potential that would contribute greatly to the public health and welfare.

Plaintiffs, through counsel who represented them at the hearing, requested a 30 day adjournment to study the report. In addition, counsel represented that they wished to present expert testimony in opposition to a declaration of blight at a later date. For example, counsel for Bridgewater Leasing Corp. said:

> We are here to suggest to this Planning Board that we will join with Mr. Levin in presenting to you through experts, expert witnesses,

planners, shopping center experts, the kind of development that this land needs and should have, a development which should come about by private enterprise without the necessity of blight declaration * * *.

We would suggest to you that you * * * await the opportunity for us to present to you additional testimony by experts of the kind I had described so that you would have before you a complete record. * * *

In the course of requesting the adjournment, counsel for one plaintiff said:

* * * I can assure you, Gentlemen, and this is not meant to be a threat, that if this area is declared blighted in view of the fact that several very large corporations are prepared to do something in developing the land, that if this happens, we will have no alternative but to tie this land up in litigation for years at a cost of thousands and thousands of dollars to the Township of Bridgewater.

The hearing was adjourned to July 17 and, at plaintiffs' request, again continued to August 20, 1968. The primary reason for the additional time was so the "experts with whom * * * preliminary discussions" have been had "can be properly engaged [by plaintiffs] and given an opportunity to make their studies." When the hearing reconvened on August 20, counsel for plaintiff Levin (a partner of the attorney who had appeared at the earlier hearings) advised the Board that the joint interests of Levin and Vornado "now own and have under contract and control over 20 acres of [contiguous] land in the area commonly known as the Golden Triangle Tract and they are forthwith going to apply to the Building Inspector * * * to construct a shopping center." When it was suggested that the adjournment was granted to enable plaintiffs to obtain and introduce expert testimony, and not to enable them to assemble additional land in the meantime, counsel said:

But I think that under the terms of the hearing, whether at this juncture they chose to then continue on with expert testimony on the entire matter was a decision that they arrived at not to do.

He informed the Board that no testimony, expert or otherwise, would be offered, and since plaintiffs now had the 20 acres referred to for a shopping center he requested that no declaration of blight be made. When inquiry was made by the Board as to the location of the assembled 20 acres, counsel said he was unable to identify it beyond the fact that it was contiguous land. (The record now reveals that during that summer Levin, Bridgewater Leasing and Brick Stores added the Wollman holdings of 14.48 acres to Bridgewater Leasing's 5.05 acres and thus secured control of contiguous property, almost all of which is in Block 4463.) No further testimony being offered, the hearings were closed.

On September 10, 1968, the Planning Board adopted a resolution declaring the Triangle blighted. Based largely on the Lindbloom report, the Board found among other things:

2. That the balance of the area investigated includes approximately 122.06 acres of which 47.64 acres are owned by the Township of Bridgewater, 26.21 acres are included within the right-of-way of improved and unimproved streets, 44.22 acres are in private ownership, and 3.99 acres of unknown ownership, all according to current municipal tax records. The land owned by the Township of Bridgewater is scattered throughout the area.

3. That the only improved street in the area is Sixth Avenue. The area is sparsely vegetated and has no unusual topographic or soil problems. The area is included with the C-2 Regional Business Zone, under the local zoning ordinance in which the principal permitted use is regionally oriented shopping centers with a minimum lot size of 10 acres.

4. The area in question, for the most part, was originally platted in a small lot pattern for the development of one family homes. At the time of original subdivision, Routes 22, 202-206 and 287 did not exist. The grid pattern of streets created blocks 200 feet deep by 600 feet in length, with lots platted at 100 feet by 100 feet, and 40 feet by 100 feet.

5. Over the years since original platting, very little development has taken place. Portions of many of the 100 ft. by 100 ft. lots have been subdivided and resold. Exhibit PB-2, a Property Ownership Map, clearly illustrates the restrictions to development caused by diversity of ownership.

6. In addition to the development limitation related to diverse ownership, private development is also stagnated by the actual lot platting and street layout of the area. Even should a de-

veloper acquire a minimum area of ten acres, the surrounding street pattern would present an awkward relationship at best. Piecemeal development even in ten acre parcels, combined with the existing street pattern, even if this were possible, would likely destroy any chance of the area achieving its maximum development potential. This potential can only be achieved by a re-planning of the entire area without regard to the present lot layout, ownership patterns and existing street patterns.

7. Township ownership is scattered. If the Township were to sell its holdings to a developer, the development limitations described above would not be removed and might even be compounded.

8. With the highway construction in the Township, the area has become undesirable for residential construction and has developed a strong potential for regional shopping development. The present residential lot platting, street layout, and diversity of ownership has resulted in an inability for anyone to attempt to assemble the entire tract or such a portion as would not compound the problem of orderly development of the remainder.

9. The total lack of proper utilization of this area results from a combination of the factors hereinbefore described. This has resulted in a stagnant and unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare.

The Township Committee approved the Planning Board resolution and its determination of blight on October 7, 1968, and shortly thereafter these prerogative writ proceedings were instituted by plaintiffs. Thus far, more than two years have been consumed with the litigation. Trial of the matter in the Law Division took about 10 days. Relying upon *Lyons v. Camden,* 48 *N. J.* 524 (1967) and 52 *N. J.* 89 (1968), plaintiffs persuaded the trial court to give them what was substantially a *de novo* review of the blight determination. In short, in spite of the deliberate decision to produce no evidence before the Planning Board, plaintiffs were allowed to attack its determination on the basis of evidence which in fairness they should have presented for consideration at the first level of determination. In this connection, it may be noted also that, in spite of the representations made to induce adjournments of the administrative hearing so that the experts described particularly by counsel for Bridgewater Leasing Corp. could be produced, plaintiffs' expert, Candeub,

whose favorable report for plaintiffs' interest was dated July 1969, was not engaged until the summer of 1969.

It was. not this Court's intention in *Lyons* to authorize persons opposed to a determination of blight to withhold evidence available to them or to make no effort to obtain and to submit evidence in support of their position at the Planning Board hearing. That is the place and time where ordinarily the basic record should be made. In the later prerogative writ proceedings, *"additional pertinent* evidence" (emphasis added) may be presented by either party in support of the position he espoused below. *Lyons v. Camden, supra,* 48 *N. J.* at 533–534.

Defendants maintain that plaintiffs' deliberate course of action before the Board should estop them from introducing evidence in the Law Division. Although we agree that equities of the quality present in *Lyons* do not appear to exist here, since the trial court allowed plaintiffs to produce evidence which ordinarily should be submitted to the Board and since it decided the merits of the issue, we shall do likewise. We caution, however, that *Lyons* should not be read to sanction a willful withholding of facts at or a willful failure to prepare for the Planning Board hearing in the expectation of obtaining a full *de novo* trial in the Law Division.

At the hearing in the Law Division, plaintiffs again failed to call the "expert witnesses" and "planners" they pleaded for permission to produce before the Planning Board in order to demonstrate that the area was not blighted. They did call one expert planning and urban renewal consultant — Isadore Candeub who is now described as their "primary" witness. As noted earlier, in September 1964, Candeub both orally and in writing advised the Planning Board that the Triangle, in his opinion, was "eligible" for a declaration of blight under the State statutes. Moreover, he said, "it would be a simple matter for his concern to make a survey for eligibility which would hold up in the Courts." Now, appearing almost as a last minute witness for plaintiffs, he testified that he found no evidence of blight in the Triangle.

In this more recent view, he expressed the opinion that the New Jersey Blighted Area Act is essentially a last ditch remedy utilizable only when the existing land condition cannot be corrected through the normal processes of the market. Although not disputing that the area was undeveloped, he felt this was due largely to the paper streets and insufficient street and highway access. He contended that the appearance of the major highways on its boundaries, resulting in increased land prices in the Triangle and in the recent assemblage of some parcels by the Levin-Vornado group and Wollman for the purpose of shopping center use, refuted any claim that the land was stagnant. It was his conclusion that private developers could be relied upon to develop the area. He suggested, as an alternative measure to the blight declaration, that a shopping center be permitted on the plaintiffs' Block 4463 and that the development of the remainder of the Triangle "could be carefully unified with" that Block. Another alternative, in his opinion, would be consolidation of the Township's holdings with those of plaintiffs and development of the entire tract.

Candeub, in his report to the plaintiffs and in testimony, opined that plaintiffs' tract in Block 4463 was arbitrarily included in the blight declaration. But Levin regarded it as the "core or heart" of the Triangle. Likewise, Candeub said that it was arbitrary to exclude the portion containing the Somerville Inn and Elks Club from the area designated as blighted. Both Lindbloom and the Planning Board concluded otherwise because of that Block's location in the Triangle and because the existing construction would not be incompatible with the ultimate development of the area. Here again Candeub shifted his ground. In 1964 when he supported a blight declaration, he told the Planning Board and the Township Committee that it would not be necessary to acquire the Elks Club property.

In our judgment, the weight of Candeub's testimony is open to serious question. It seems probable from his early statements in the case that if the Township had signed the

1964 contract he submitted and had engaged him as its planning expert to prepare a report in support of his opinion that the Triangle was blighted, which report, he assured, "would hold up in the Courts," he would not have been available to testify for the plaintiffs in this litigation. His ambivalence and the failure of plaintiffs to produce any of the other "experts" referred to before the Planning Board must reflect adversely upon plaintiffs' challenge to the blight declaration.

The records show that plaintiff Philip J. Levin, who testified in the Law Division but not before the Planning Board, has considerable experience as a developer of both regional and local shopping centers. He testified that a major regional shopping center is the most logical use for the 120 acre Triangle which offers substantial potential for that use as well as for a possible complex of an office building, research laboratory, public facilities and perhaps multiple dwelling housing on the perimeter. The 20 acre tract, which he and his partners in the joint venture now own, in his opinion, is in the heart of the Triangle. He considers this a strategic location and believes that it would not be economically feasible for anyone else to undertake to develop the Triangle without including his tract sitting in the heart of the project. Thus he believes that he and his joint venturers are the most logical ones to acquire all the land whether by bidding or on any other economic basis.

Presently his group has not prepared plans either for development of the entire area or for a shopping center to be located on their present holdings. It is impossible at this stage, Levin said, to formulate any fixed development plans. He recognized that their tract now has access to Routes 202–206 only by means of a ramp, but he opined that further acquisition of land would increase the means of ingress and egress without much difficulty.

Levin indicated that he would like to start out with a 10–12 acre shopping center and then expand it with the passage of time and indications of successful operation. The initial

operation would be a group of stores with a small enclosed mall. It would take a minimum of three to five years to develop a 50 to 60 acre center. In his judgment, this Triangle does not call for a Class A type of mall such as Short Hills, Cherry Hill, Willowbrook, or Bambergers' Paramus. It is difficult to say now just what type should go on this site; it would be difficult to compare it with any other one in New Jersey. But whatever he built would conform with the modern mall approach. It would not be the cement block or old warehouse type discount store, but a first class structure built in the new type of decorative fieldstone — brick colonial type of construction—which would lend itself to attracting tenants from whom the best rents could be obtained.

Levin also testified that there was no firm agreement or understanding that a Two Guys store would necessarily be opened on the site. That would depend on how Vornado sized up the situation and what its budget commitments were at the particular time. He said further that if another prospective high quality tenant offered a more desirable rental, Vornado would probably accept and consider its part in the enterprise as an investment. It must be said, however, that the impression comes through the testimony that a Two Guys store would have the "first refusal."

Levin made plain his opinion that the Triangle could be developed privately without a declaration of blight. Any parcels that were not acquired could be built around and he did not "need" the Atria 5.05 acre holding. However, he did not attempt to discuss with any particularity the many problems associated with (1) diverse ownership of the lots, (2) questionable or invalid titles resulting from defective tax foreclosure proceedings, (3) what may be conflicting conveyances by Prudential Development Company, or (4) the need for vacation of many paper streets in order to provide proper and convenient Triangle ingress and egress. Nor did he undertake to compare either the feasibility of or the time involved in making the tract ready for development by a private developer as opposed to a municipal corporation

which, under its power of eminent domain, could move into possession after affirmance of a declaration of blight and allow the matter of compensation to owners and the other problems mentioned above to be disposed of in due course. At any rate, Levin indicated that if the blight declaration were affirmed, he would still be interested in acquiring and developing the land, if the Township would not interfere substantially with the exercise of his judgment as to the course and manner of development.

Wollman appeared as a witness for plaintiffs. He maintained that the lots in the Triangle could be assembled and developed by a private developer without the Township's intervention. However, as detailed above, he had endeavored to assemble acreage between 1965 and 1968 for a regional shopping center with a Macy-Bamberger's department store as the lead tenant. His aim was to acquire 60 to 80 acres for the purpose and to create a shopping center similar to the one at Cherry Hill. In fact, the Township authorities discussed the plan with Wollman and Macy representatives. According to Wollman, the Macy people "completely satisfied" the Township representatives that the development would be "a shopping center of a high character, anchored by a first quality department store, such as Bamberger's, together with the satellite stores which are in character because Macy's sets the tone of the shopping center. The key department store at any center has a veto on the type of stores that make up the complex at the center."

But during the 1965-1968 period Wollman had actually acquired only 14½ acres, most of it within Block 4463 where the area had not been laid out in the gridiron pattern of small lots as it was in Floral Park. Likewise, by early 1968, Levin-Vornado interests had assembled only 5.05 acres and with few exceptions the lots acquired were also within Block 4463. In June 1968, Wollman testified that he sold his land to Levin-Vornado, thus enabling the latter interests to acquire the 20 plus acres they now hold. This transfer seems to have been made under a rather loose arrangement which the trial

court found could be "rescinded by the purchaser within a four year period by forfeiture of certain sums paid." We have made no analysis of the transaction since its nature has had no significant bearing upon the decision we have reached on this appeal.

Plaintiffs called Lindbloom and examined him at length about his conclusion that the Triangle was blighted within the meaning of subsection (e) of the Blighted Area Act. He adhered to his view that the land is undeveloped, stagnant and unproductive for the reasons generally outlined above. In his view, a finding of "stagnation" was not negated because some land assemblage had been accomplished by competing interests which were willing to speculate on the Triangle's potential for development. He stated that piecemeal development, "even in 10 acre parcels," combined with the existing street pattern, if it were possible, would be likely to destroy any chance of achieving its maximum economic potential. "This potential," he said, "can only be reached by a replanning of the entire area without regard to the present lot layout and street pattern" and by developing it as an integrated whole.

Lindbloom had emphasized the diversity of ownership in the Triangle and, based on the municipal tax records, had mentioned generally some title problems that he thought existed. About two years before his blight report to the Planning Board, one plaintiff's counsel in his letter, already referred to herein, said that "some of the titles which allegedly belong to the Township are in question." Lindbloom's limited comments about title ownership were bolstered and considerably enlarged upon by the testimony of Richard Murray, an attorney and title expert. Introduction of this additional support for the finding of blight, to the extent that it was based on conditions of title, finds adequate authorization in *Lyons v. Camden, supra,* 48 *N. J.* at 534. Murray had been retained by the municipality to examine and study the titles in the Floral Park tract. His undisputed testimony as a title expert not only adds to Lindbloom's report

and testimony on the subject of diversity of ownership in the area but also reveals many defective titles as well as conflicting claims of ownership to a number of lots.

Lindbloom's report had noted some 55 private owners of lots in the platted area of the Triangle according to the tax records. Murray's study of municipal and "unknown" titles and the testimony of Grimaldi (who was plaintiffs' witness) disclosed an adverse title claim in Capital Property Associates to from 45 to 50 additional parcels. The Township assumed that it held title to them deriving from the two deeds from the trustees in dissolution of the Prudential Development Company. As noted above, tax foreclosures had brought to the Township ostensible title to 268 parcels in the Triangle. Nonpayment of taxes and tax foreclosures are themselves common incidents of a blighted area. *Redevelopment Agency of San Francisco v. Hayes,* 122 *Cal. App.* 2d 777, 266 *P.* 2d 105, *cert. den. sub. nom. Van Hoff v. Redevelopment Agency of San Francisco,* 348 *U. S.* 897, 75 *S. Ct.* 214, 99 *L. Ed.* 705 (1954). Moreover, Murray's unquestioned testimony shows that the Township's title to 44 lots is flawed because of defective tax foreclosure proceedings. In at least five instances, no title at all was acquired by the foreclosure. In the other cases, questionable proceedings resulted in uninsurable titles. The situation probably could be remedied by reforeclosure, if all the difficulties that have been created by the passage of time and the emergence of new interests were overcome. Murray pointed out, however, that upon reforeclosure the various lots would be subject to public bidding —and in view of the speculative interest in the Triangle, he thought this might produce a "California gold rush."

The Lindbloom report had listed 29 parcels as in "unknown" ownership. Thereafter, the title experts seem to have identified these owners. However, it seems apparent that many of them are tax delinquents. Moreover, the whereabouts of at least some of them are unknown, and there seems to be no sufficient information as to whether they are still alive, or if not, who are their heirs and where they can be

located. Thus the probability is that, if necessary, even tax foreclosure in these cases would involve protracted proceedings.

Murray found owners of record as of 1918 for eight of the lots listed on the tax records as in unknown ownership. Taxes are delinquent on these lots and they are subject to foreclosure. But undoubtedly in the more than 50 years intervening at least some of these owners have probably died and their interests have passed by testate or intestate succession to multiples of the original eight. Thus the title problems are compounded and many additional persons will perhaps have the right to redeem on foreclosure.

Murray projected other title difficulties. He said that defects existed in some foreclosure proceedings after which the lots were conveyed by the Township to private owners. He also suggested that a change in the boundary line between Somerville and Bridgewater involved a transfer and exchange of certain defective tax titles in the southern portion of the tract. Other lots in the same area where defective foreclosures occurred were subsequently conveyed by Bridgewater to persons such as James Atria, a five-plus acre holder. This southern portion of the Triangle, which included Atria's holdings, is an important part of the area because it provides a major access to Route 22.

Although Murray's engagement was limited to a study of the titles apparently vested in the municipality and those whose ownership was designated "unknown," he was generally familiar with titles in the area. It was his "certain" opinion that titles to some of the parcels held by private individuals are defective because they derive from defective tax foreclosures.

There can be no doubt that the serious title questions described above are of the nature contemplated by the phrase "condition of the title" set out in subsection 21.1(e) as one of the tests of blight.

Everyone in the case accepted the fact that effective redevelopment of the Triangle would necessitate vacation of

many of the paper streets which traverse it. But as Murray said, vacation might well leave private rights untouched in some situations. *Highway Holding Co. v. Yara Engineering Corp.*, 22 *N. J.* 119, 126 (1956). It seems obvious that a declaration of blight would facilitate municipal action, through the power of eminent domain if necessary, in overcoming problems arising out of the need to vacate the streets. 11 *McQullin, Municipal Corporations,* § 30.202b, p. 166–67. Such problems are within the scope of "conditions of title" and are also comprehended by the phrase "other conditions" in subsection 21.1(e).

Defendants produced Walter Johnson, an expert on regional shopping center development. He considered the "Golden Triangle" the "next Paramus" and concurred in Lindbloom's view as to the desirability of unitary development. He described the manner in which it could be developed and the urgency of replanning for regulation of traffic entering, leaving and traveling within the area. He said that to carve out plaintiffs' lands from the blighted area would be to hinder creation of an integrated and comprehensive plan, to interfere with establishment of an internal road system, and to create traffic access problems, thus, in effect, to "kill it." In a portion of his testimony he said:

> However, the important thing to remember is what comes after it is planned as a piece. You do not start out with pieces of land in haphazard and random shapes and sizes. I cannot think of a successful center of this magnitude which has been developed as pieces as they happen to fall.
>
> \*   \*   \*   \*   \*   \*   \*   \*
>
> I think it is important to realize that this potential has to be developed as a piece and developed in a coordinated way. Otherwise, I would not say it had the potential that I have described.

That view squares with Levin's testimony, already related, about the importance of the plaintiffs' property in Block 4463, *i. e.,*, since it constitutes the "core or heart" of the Triangle "it's hard for me to foresee \* \* \* where it would be economically feasible for anyone else to accept [such] a

layout * * *." Lindbloom also was in accord. In his opinion, if Block 4463 were developed in a permitted use, "the development possibilities and opportunity for replanning in an orderly manner the surrounding small parcels, and of course, that of the entire area would be further restricted."

The trial court in a comprehensive unreported opinion, which dealt extensively with the factual and legal problems involved, sustained the municipal determination of blight. Our study of the record has led us to the same conclusion.

The decision of the municipal authorities that the area in question is blighted came to the Law Division invested with a presumption of validity. To succeed, plaintiffs had the burden of overcoming that presumption and demonstrating that the blight determination was not supported by substantial evidence. If a reviewing court finds that the determination was grounded on substantial evidence, it must be affirmed. *Lyons v. Camden, supra,* 48 *N. J.* at 532–534; *Id.* 52 *N. J.* at 93, 98; *Wilson v. Long Branch, supra,* 27 *N. J.* at 390–391; *N. J. S. A.* 40:55–21.6.

Judicial review of a blight determination must be approached with an acute awareness of the salutary social and economic policy which prompted the various slum clearance and redevelopment statutes. To effectuate those policies, we are obliged to interpret the powers granted to the local planning board liberally and to accept its exercise of the powers so long as a necessarily indulgent judicial eye finds a reasonable basis, *i. e.,* substantial evidence, to support the action taken. In short, while the board's discretion in administering the law is not unfettered, its vista is a broad one. *Jersey City Chapter of the Property Owner's Protective Assoc. v. City Council of Jersey City, supra,* 55 *N. J.* at 97–98.

As we have said, the legislative purpose is not confined to the elimination of "perceptually offensive slums." The specific provisions of subsection (e) of the Blighted Area Act, *N. J. S. A.* 40:55–21.1, of the Local Housing and Redevelopment Agencies Acts, as well as the declarations of

policy contained therein, reveal a much broader aim. That aim is the redevelopment of areas that qualify as blighted so as to restore or to apply them to uses which will serve the community benefit. More specifically, the Legislature recognized that at times, usually over a long period, potentially useful land reaches a stage of stagnation and unproductiveness through one or more causes. Consequently, it declared that where parcels of vacant land are characterized by lack of proper utilization resulting from obsolete platting, diversity of ownership, retardation or arrest of development of the lots for the purposes originally planned because of lack of demand for that use and where such conditions have resulted in tax delinquents and widespread acquisition of good or doubtful title in the municipality, the area is blighted. The Legislature, therefore, authorized the revitalization of the area so that it could be made to serve the community welfare, and it sanctioned remedial action either by the municipality alone or with the aid of private developers or by private development alone. *N. J. S. A.* 40 :55–21.10.

We find no persuasive evidence in the record in opposition to the view that the community interest will be best served by integrated and compatible development of the entire 120 acre Triangle. If it was properly declared a blighted area, the conclusion is inescapable that the Township Committee in good faith intends to achieve that kind of development.

There emerges from a dispassionate study of the record here the conclusion that when the Township Committee adopted the resolution directing the Planning Board to investigate and report on the blight problem, this 120 acre Triangle was then and thereafter stagnant, undeveloped and unproductive. Over the years, except for construction of a few scattered homes, it had become an economic wasteland. And fairly considered, it was a blighted area within the sense of subsection 21.1(e), as the Planning Board and the Township Committee found and as the trial court agreed. Plaintiffs criticize the Township for not selling its large

holdings to private entrepreneurs and permitting them to take on the development of the area. But they overlook the fact that the title problems complicate the marketing process. Obviously a representation of clear title as to many of the lots could not be made for public sale purposes, and considerable time and effort would have to be spent before the title problems could be cleared up. But following a declaration of blight, by exercising its powers of eminent domain, if necessary, the municipality need not spend years resolving title problems and disputes, but may proceed with productive utilization of the entire area and compensate any persons who may be found to have valuable interests therein, when such issues are settled or adjudicated. See *N. J. S. A.* 20:1–36.

Blighted Area Acts, such as *N. J. S. A.* 40:55–21.1 *et seq.,* are concerned with areas and not with individual properties. The fact that single parcels in the area are useful and could not be declared blighted if considered in isolation is basis neither for excluding such parcels nor for invalidating a declaration of blight. *Lyons v. Camden, supra,* 48 *N. J.* at 536. So long as the area designated as blighted is the portion of the municipality which, in the judgment of the appropriate local body, falls within the broad terms of the definition laid down by the Legislature, the courts will not interfere in the absence of palpable abuse of discretion or bad faith. *Wilson v. Long Branch, supra,* 27 *N. J.* at 379.

We see no reasonable basis in this case for challenging the decision of the local bodies that the Triangle should be considered as a single area and developed in a homogenous fashion with a regional shopping center as the nucleus. That developmental goal seems common to all the interested parties in the case. Such unitary development represents the maximum potential usefulness within the aim of the Blighted Area Act and particularly of subsection 21.1(e). The recent flurry of speculative activity and the attendant attempts to assemble lots in the area do not negate the land's long standing condition of stagnation and unproductiveness. Rather, it

confirms the view that although fallow so long and thus blighted, because of the combination of conditions which brought that state about, it now has a high potential for fruitful utilization. The desire of plaintiffs to use their own tract for development as a shopping center or to have the opportunity to assemble all of the land in the Triangle over a period of years for complementary development should not militate against the blight declaration. So far as plaintiffs' tract is concerned it must be considered an essential part of any comprehensive redevelopment project, if optimum community benefit is to be realized. Everyone agrees with Levin's evaluation of plaintiffs' tract as the heart of the Triangle. We see no basis for interfering with the municipal view that their holdings should be included in the blighted area. *Berman v. Parker,* 348 *U. S.* 26, 75 *S. Ct.* 98, 99 *L. Ed.* 27 (1954). If the local decision that the area is blighted within subdivision 21.1(e) is supported by substantial proof, the manifold conditions responsible for the blight provide further support for the view that the declaration should be made because the stagnating conditions can best be overcome by the exercise of the many remedial powers of the municipality.

As we said in *Wilson v. Long Branch, supra,* community redevelopment is a modern part of municipal government. Soundly planned redevelopment can make the difference between continued stagnation and decline and a resurgence of healthy growth. It provides the means of removing the decadent effect of blight on neighboring property values and of opening up new areas for residences and industry. In recent years, recognition has grown that governing bodies must either plan for the development or redevelopment of blighted areas or permit them to become more deteriorated, obsolescent, stagnant, inefficient and costly. It is no longer open to question that the elimination of a blighted area of the nature described in *N. J. S. A.* 40:55-21.1(e) is a public purpose intimately related to the public health and welfare. Nor is it questionable that the ultimate taking of such land for re-

development for the benefit of the community as a whole is a constitutional taking for "public use." *Wilson v. Long Branch, supra,* 27 *N. J.* at 370–371, 376; see *Jersey City Chapter of the Property Owner's Protective Assoc. v. City Council of Jersey City, supra,* 55 *N. J.* at 97–98. In this case, we are satisfied that the facts which have been detailed at considerable length above constitute substantial evidence that the Triangle is a blighted area within the commonsense of subsection 21.1(e). Moreover, we find no adequate justification for concluding that the discretion of the municipal bodies was exercised abitrarily in reaching the determination that the entire Triangle as described in the resolution is blighted or that its redevelopment as an integrated whole is in the interest of the public health and welfare.

Although we have found no case precisely the same as the present one, the New York Court of Appeals ruled upon a similar situation in *Cannata v. City of New York,* 11 *N. Y.* 2d 210, 227 *N. Y. S.* 2d 903, 182 *N. E.* 2d 395, *appeal dismissed,* 371 *U. S.* 4, 83 *S. Ct.* 21, 9 *L. Ed.* 2d 48 (1962). The blight statute of that state contained provisions very much like those set out in our subsection 21.1(e). The Planning Commission, after hearings, declared that a 95 acre tract in the Canarsie section of Brooklyn was blighted. It appeared that 75% of the area was vacant, that the area was subdivided into plots of such form, shape and insufficient size as to prevent effective economic development, that the streets were obsolete and of poorly designed patterns, and that the improvements were scattered and incompatible with appropriate development. The purpose of the determination of blight was to enable the redevelopment of the tract as an industrial park. Plaintiffs were owners of 68 private residences in the area which were not claimed to be physically deteriorated. They asserted that the statute was unconstitutionally applied to them because the area was not a slum and it was unlawful to take their sound property from them and sell it to an unnamed private developer for an industrial park project simply because city planners deemed it wise and more

advantageous to the city to convert the developed residential parcels and the vacant land into industrial sites.

The Court of Appeals sustained the declaration of blight. It agreed with the trial court that the area does not have to be a "slum" to make its redevelopment a public use, and that public use is not negated by a plan to turn a predominantly vacant, poorly developed and organized area into a site for new industrial buildings. The Court said:

> We see nothing unconstitutional on the face of this statute or in its proposed application to these undisputed facts. Taking of substandard real estate by a municipality for redevelopment by private corporations has long been recognized as a species of public use. * * * The condemnation by the city of an area such as this so that it may be turned into sites for needed industries is a public use. 227 *N. Y. S.* 2d at 906, 182 *N. E.* 2d at 397.

See also *Redevelopment Agency of San Francisco v. Hayes, supra,* 266 *P.* 2d at 118–122; *Oliver v. City of Clairton,* 374 *Pa.* 333, 98 *A.* 2d 47 (1953).

Plaintiffs suggest that the blight determination was made in order to prevent them from developing their acreage for the type of shopping center they wished to create. More particularly, they charge that the motive of the Planning Board and the Township Committee was to keep a Two Guys type of center out of the municipality. Thus, they allege that the action was taken in bad faith and in the final analysis was designed to take their property by eminent domain, if necessary, and to transfer it to another private individual or corporation for development along lines which the local authorities can control.

■ Our careful study of this record has left us with the conviction that both municipal bodies conducted the blight proceeding in complete good faith. We find also that they pursued the proceeding in the honest belief that if the Triangle was blighted within the contemplation of the statute, the public good would be served by redevelopment of the area as a unit by a private developer, selected by the Township Committee, who would assemble and develop the land

with its assistance and within such reasonable conditions with regard to the manner and course of development as it might impose. *Cf. Jersey City Chapter of the Property Owner's Protective Assoc. v. City Council of Jersey City, supra,* 55 *N. J.* at 88. We do not have before us, and we do not deal with, a situation where a proposed developer had assembled the entire Triangle area and was ready to develop it as a regional shopping center and the municipality then sought a blight determination in order to enable it to select a different developer who would act according to a plan it prepared.

It is true that some individual members of the Township Committee indicated that they wished to bring a high quality shopping center to their community; also that at least one member expressed the view that a Two Guys center did not represent the type he had in mind. But no official action has been taken which excludes plaintiff Levin from consideration as a candidate for selection as the overall developer of the Triangle after the blight declaration. In fact, it seems plain from the statements of municipal officials that his application, if made, will receive good faith evaluation and fair treatment.

Once a proper declaration of blight is made, there is no substance to the contention that the result of the governmental action in selecting a redeveloper is to take property from one individual and turn it over to another in violation of the due process requirements of the Federal Constitution. The Blighted Area Act provides that following a declaration of blight the governing body may, by resolution, agree that a private corporation or individual may be chosen to undertake the redevelopment project according to a comprehensive plan created or approved by it. *N. J. S. A.* 40:55–21.10. In this event, the private developer is really the instrumentality used to accomplish the public purpose. And the possibility that some profit may eventuate therefrom does not render such means unlawful. Neither the Federal nor the State Constitution presents a barrier to such a municipal course of ac-

tion. *Berman v. Parker, supra,* 348 *U. S.* at 33–34, 75 *S. Ct.* at 103, 99 *L. Ed.* at 38; *Wilson v. Long Branch, supra,* 27 *N. J.* at 376; *Redevelopment Agency of San Francisco v. Hayes, supra,* 266 *P.* 2d at 122.[2] As the United States Supreme Court said in *Berman v. Parker* in this connection:

Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. * * * The public end may be as well or better served through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects. 348 *U. S.* at 33–34, 75 *S. Ct.* at 103, 99 *L. Ed.* at 38.

Finally, plaintiffs argue that subsection 21.1(e) of the statute is unconstitutional because it delegates ·unbridled

[2]The dissent refers to and quotes at some length from *Schneider v. District of Columbia,* 117 *F. Supp.* 705 (D. D. C. 1953), which involved an attack on the constitutionality of the District of Columbia Redevelopment Act. A three judge District Court sustained · the Act, but in an opinion which took a restrictive · view of the scope of authority conferred thereby on the Redevelopment Land Agency. On appeal, the United States Supreme Court in a unanimous opinion affirmed the judgment, *sub nom. Berman v. Parker, supra.* But in doing so it sharply modified the views expressed below and said that the judgment appealed from was affirmed "as modified." 348 *U. S.* at 36, 75 *S. Ct.* at 104, 99 *L. Ed.* at 39.

The Supreme Court opinion in *Berman* undoubtedly represents the most liberal judicial recognition in the country of the scope of the legislative grant of power to a redevelopment agency to deal with land areas which may be declared blighted. Among other things, the Court said:

We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. * * * The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's

legislative power to the municipal agencies without setting out adequate standards to guide and control the exercise of the power. We see no merit in the contention. *Wilson v. Long Branch, supra,* 27 *N. J.* at 378; and *compare, Jersey City Chapter of the Property Owner's Protective Assoc. v. City Council of Jersey City, supra.*

The judgment of the Law Division is affirmed.

HANEMAN, J. (dissenting). We are here confronted with a question of novel impression, *i. e.,* the construction and application of a statute granting a municipality the power of condemnation of vacant, unimproved land, after a munici-

---

Capitol should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way. 348 *U. S.* at 33, 75 *S. Ct.* at 102, 99 *L. Ed.* at 38.

Further:

> * * * But we have said enough to indicate that it is the need of the area as a whole which Congress and its agencies are evaluating. If owner after owner were permitted to resist these redevelopment programs on the ground that his particular property was not being used against the public interest, integrated plans for redevelopment would suffer greatly. The argument pressed on us is, indeed, a plea to substitute the landowner's standard of the public need for the standard prescribed by Congress. 348 *U. S.* at 35, 75 *S. Ct.* at 104, 99 *L. Ed.* at 39.

The dissent in the instant case also includes a quote from *Redevelopment Agency of San Francisco v. Hayes, supra,* which in turn relies upon and cites as authority *Schneider v. District of Columbia, supra.* Quite obviously the *Hayes* opinion was written before *Schneider* was modified by *Berman v. Parker.* Moreover, two tracts of land were involved in *Hayes.* Both were declared blighted and the California Court of Appeals sustained both declarations. The condition of one of the two tracts was similar to that presented in the case before us, including the fact that 65% of the land was publicly owned having been acquired in many instances by tax foreclosures. The California blight statute contained substantially the same language as *N. J. S. A.* 40:55-21.1(e). See 266 *P.* 2d at 118. It was claimed that the tract had remained undeveloped because of the City's failure to utilize or make available the portion owned by it for utilization. The Court of Appeals did not regard that circumstance as a bar to the blight declaration. It said on that subject:

> We fail to see how the failure of the city to develop its portion of the Diamond Heights Area in the past estops or prevents it from redeveloping the entire area. 266 *P.* 2d at 127.

pal declaration of blight. It is to be noted that the condemnation is not for the elimination of a slum or the construction of residential accommodations.

Plaintiffs argue, *inter alia,* that the action of the municipality in declaring the land here involved to be blighted is unconstitutional in that the facts do not support a conclusion that there is a need to seize said lands for a public purpose and that in any event, the facts fail to meet the criteria embodied in the statute as a basis for the declaration of blight and the ultimate employment of the power of condemnation. Plaintiffs further argue that the declaration of blight is here not motivated by the declared policy of said statute but that the declaration of blight is being used for an ulterior and not public purpose and constitutes, therefore, a perversion of the statute. Accordingly, plaintiffs conclude that municipal declaration of blight is *ultra vires,* arbitrary, capricious and unreasonable. In final analysis, the questions projected by plaintiffs, regardless of how stated, classified or categorized, are — (1) Did the facts here present warrant a declaration of blight? and (2) Was the municipality's blight declaration a subterfuge to accomplish results not contemplated and authorized by *N. J. S. A.* 40:55–21.1, *et seq?*

Not only has this State not been confronted with these specific problems, but there are few, if any, cases reported in other states which have considered the precise questions under similar statutes. Some states have tangentially treated the present arguments but are not finally dispositive thereof. *Cf. Schneider v. District of Columbia,* 117 *F. Supp.* 705 (*D. D. C.* 1953) *aff'd sub nom. Berman v. Parker,* 348 *U. S.* 26, 75 *S. Ct.* 98, 99 *L. Ed.* 27 (1954) ; *People ex rel. Gutnecht v. City of Chicago,* 414 *Ill.* 600, 111 *N. E.* 2d 626 (*Sup. Ct. Ill.* 1953) ; *Oliver v. City of Clairton,* 374 *Pa.* 333, 98 *A.* 2d 47 (*Sup. Ct. Pa.* 1953) ; *Crommett v. City of Portland,* 150 *Me.* 217, 107 *A.* 2d 841 (*Sup. Jud. Ct. Me.* 1954) ; *Redevelopment Agency of City, etc. v. Hayes,* 122 *Cal. App.* 2d 777, 266 *P.* 2d 105 (*Dist. Ct. App. Cal.* 1954) cert. *den. sub nom. Van Hoff v. Redevelopment Agency,* 348 *U. S.* 897, 75 *S. Ct.* 214, 99

L. Ed. 705 (1954); *Hogue v. Port of Seattle,* 54 *Wash.* 2d 799, 341 *P.* 2d 171 (*Sup. Ct. Wash.* 1959); *Cannata v. City of New York,* 11 *N. Y.* 2d 210, 227 *N. Y. S.* 2d 903, 182 *N. E.* 2d 395 (*Ct. App. N. Y.* 1962); *Randolph v. Wilmington Housing Authority,* 37 *Del. Ch.* 202, 139 *A.* 2d 476 (*Sup. Ct. Del.* 1958); *Opinion of the Justices,* 332 *Mass.* 769, 126 *N. E.* 2d 795 (*Sup. Jud. Ct. Mass.* 1955).

The entire section of the statute, *N. J. S. A.* 40:55–21.1, subparagraph (e) of which is here involved, reads as follows:

1. As used in this act, the term "blighted area" shall mean an area in any municipality wherein there exists any of the conditions hereinafter enumerated:

(a) The generality of buildings used as dwellings or the dwelling accommodations therein are substandard, unsafe, insanitary, dilapidated, or obsolescent, or possess any of such characteristics, or are so lacking in light, air, or space, as to be conducive to unwholesome living;

(b) The discontinuance of the use of buildings previously used for manufacturing or industrial purposes, the abandonment of such buildings or the same being allowed to fall into so great a state of disrepair as to be untenantable;

(c) Unimproved vacant land, which has remained so for a period of ten years prior to the determination hereinafter referred to, and which land by reason of its location, or remoteness from developed sections or portions of such municipality, or lack of means of access to such other parts thereof, or topography, or nature of the soil, is not likely to be developed through the instrumentality of private capital;

(d) Areas (including slum area), with buildings or improvements which by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community;

(e) A growing or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein and other conditions, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare.

### *N. J. S. A.* 40:55–21.10 reads:

If the determination is that an area is a blighted area, the governing body of the municipality may, but shall not be required to, ac-

quire the real property within the area by purchase, or by eminent domain proceedings, and may proceed with the clearance, replanning, development or redevelopment of the area as a public purpose and for public use, or the said governing body may, by resolution, agree that a private corporation may undertake such clearance, replanning, development or redevelopment in accordance with statutory authority and subject to the provisions of paragraph 1, Section III, Article VIII, of the Constitution; provided, however, that the power of eminent domain hereinbefore conferred upon the governing body of the municipality shall not be exercised to acquire, for any of the purposes of this act, any property or interests in property owned or used by any public utility (as defined in section 48:2–13 of the Revised Statutes) in furnishing any commodity or service which by law it is authorized to furnish; and provided further, however, that in any eminent domain proceeding instituted by virtue of the power hereinbefore conferred, the value of any property sought to be acquired shall be fixed and determined to be no less than the value as of the date of the declaration of blight by the governing body either in the first instance or the date of final action by the governing body upon a report by a planning board.

It is to be seen that the "blight" referred to in paragraphs (a), (b) and (d) of *N. J. S. A.* 40:55–21.1, is concerned with neighborhoods becoming "conducive to unwholesome living," "untenable" or "detrimental to the safety, health, morals or welfare of the community" because of the deteriorating or deteriorated physical condition of existing buildings and improvements. These portions of the statute clearly concern the health, welfare, morals and safety of people — the individual members of the public. The "blight" referred to in paragraphs (c) and (e) concerns neighborhoods where there are no buildings or improvements or so few as to be inconsequential. These latter sections of the statute are directed at the "general public welfare" through improvement of the economic condition of the public by developing, stimulating and increasing the growth of new resources for the employment of capital and labor by private individual transactions. "Blight" as used in (e) has reference to a vacant or predominantly vacant area found to be detrimental to sound economic growth because it is "stagnant and unproductive."

The first of the above categories is directed, as noted, at the elimination of a slum area, deteriorated or deteriorating housing, and the construction of adequate housing in place thereof. This objective constitutes a public purpose as it concerns the protection of the individual members of the public from living conditions in slums directly threatening their health, safety and morals. The existence, cause and cure of this type of blight are more easily discernible than they are in the second category. The public purpose of the second category is the improvement of the economic condition of the general public through the elimination of the lack of use of idle lands and the proper utilization thereof.

It is self-evident that the initial and crucial step to accomplish a "proper utilization" of an unimproved area is the acquisition of title by one desirous of employing the land for that purpose — and this is so whether the section to be ultilized is in a single or diverse ownership. It follows that the "lack of utilization" at which the statute is directed and which allegedly results in a "stagnant and unproductive" condition has its genesis in the failure of private capital or enterprise to acquire or assemble land for development and improvement. To justify the statutory declaration of blight there must exist a failure or refusal of private capital or enterprise to acquire or assemble land for use because such acquisition or assemblage is too costly and involved due to both a diversity of ownership and the conditions of title. Such conditions must be the cause of and result in the frustration of the desire and willingness of private capital or enterprise to purchase such acreage. The basic cause then, of the "lack of utilization" of the area resulting in a "stagnant and unproductive" condition, which the statute seeks to eliminate, is the failure or refusal of private capital or enterprise to acquire title to a vacant area because ownership and title conditions are such as to make an investment in the land unfeasible or inadvisable. Only when there is such a failure or refusal, so caused, in the face of a desire or

willingness of private capital or enterprise to so acquire does the need for municipal action arise.

Land is not stagnant in the sense that word is employed in the statute where the failure to acquire title results from the refusal of an owner to sell because he desires to preserve its character as vacant land, to hold for investment purposes or for other reasons satisfactory to himself.

The fact that it may consume less time or be less costly for a municipality to acquire title by condemnation than for an individual to pursue normal recognized methods of removal of clouds on title or of private negotiation for the acquisition are not objectives at which the statute is aimed. Neither convenience nor economy of time or finances for a private entrepreneur are elements justifying a proceeding looking toward a municipal condemnation through a declaration of blight. Accordingly, so long as private capital or enterprise is proceeding with a bona fide acquisition or assemblage of land for utilization for any of the purposes permitted by the planned unit development, site review, subdivision, zoning and planning ordinances of the municipality, no stagnation exists. Private capital and enterprise must be accorded a reasonable opportunity to so acquire title before it can be said that there is a lack of proper utilization or that the land is stagnant.

The seizure of private property must be for the declared public policy, *i. e.,* to terminate disuse and stimulate use. The statute may not be employed to control the type or manner of land use to which an area is to be put. These objectives must be attained under other statutes governing zoning, planning, subdivision, etc. Nor may it be employed as a vehicle to select the individual who will ultimately develop the land. Thus, the statute may not be used with the purpose of *controlling* the use of land or *selecting* the developer thereof or any purpose other than to make land available for a use authorized and permitted under other statutes.

The statute, as here intended to be used, does not contemplate that the municipality will itself develop the tract

but rather that it will be a conduit for the passage of title to a private entrepreneur selected by it who will agree to utilize the land. The harsh and extraordinary power of eminent domain is sought to be employed here, not for a *public use* for a public purpose, but rather for a *private use* for a public purpose. Appendant to such private use is the right of the private developer to obtain the future income and profits from the land so seized. Government is here taking land from one owner by force and giving it to another, on terms that may not benefit the former but will of necessity benefit the latter. The municipality is in effect acting as a landbroker on behalf of and representing a privileged private purchaser. In this aspect of the municipal relationship lies the inherent danger of an abuse of discretion. Where, as here, property is forcibly taken from one party for the purpose of being transferred to another, thereby excluding the consent of the owner and excluding all other prospective ultimate purchasers and developers except the one selected by the municipality, the facts which allegedly give rise to that municipal power should be closely scrutinized. The exercise of the power of eminent domain should not be permitted unless the substitution of municipal condemnation for private negotiation is clearly needed for the acquisition of title for an economic use of the land. The failure of private capital to develop land in fulfillment of a community economic need, must be the reason and not the excuse for the seizure of private property. Absent such a public need, the power of condemnation may not be employed.

There is no accusation nor hint in the present matter that the township officials are prompted to their action by anything less than what they consider for the benefit of the township. Nonetheless, municipal discretion may be abused absent a venal motive, by a declaration of blight for any purpose other than the alleviation of stagnation. In *Kaskel v. Impellitteri*, 306 *N. Y.* 73, 115 *N. E.* 2d 659, at *p.* 664 (*Ct. App. N. Y.* 1953), the court said:

If the main purpose of combining these two areas is not slum clearance, but merely to lend color to the acquisition of land for a coliseum under the guise of a slum clearance project, then the combined project is not authorized by statute, and a taxpayer's action can be maintained to restrain it under section 51 of the General Municipal Law, Denihan Enterprises v. O'Dwyer, 302 N. Y. 451, 99 N. E. 2d 235. In that event, the courts would not be invading the administrative province, but performing their duty in limiting administrative officials, capable and public spirited as they may be, to spending public money for purposes authorized by law.

In *Redevelopment Agency of City, etc. v. Hayes, supra,* the court said at *p.* 127 of 266 *P. 2d*:

Public agencies and courts both should be chary of the use of the act unless, as here, there is a situation where the blight is such that it constitutes a real hindrance to the development of the city and cannot be eliminated or improved without public assistance. It never can be used just because the public agency considers that it can make a better use or planning of an area than its present use or plan. As said in Schneider v. District of Columbia, supra, 117 F. Supp. 716 "* * * it behooves the courts to be alert lest currently attractive projects impinge upon fundamental rights."

Recent disclosure of the conduct of some public officials emphasizes the conclusion that in a world where politics is seldom absent from municipal administration there is a real and ever present risk that without a severe restriction of the power of municipal acquisition of property by condemnation, an individual without political connections runs the risk of having his property taken from him by force for the benefit of a better connected or more highly regarded individual. A prospective competitive purchaser can similarly be eliminated by the power of the municipality to later convey by a private transaction. That the owner may receive what at the time of taking may be considered reasonable compensation is, of itself, no excuse for a forcible taking.

The following cases express other and further reasons for the foregoing conclusions. They so adequately delineate the dangers attendant upon the power granted under comparable statutes and the measures which should be taken for the protection of the private owner and prospective purchaser

that I see no reason to rephrase or paraphrase the language. In *Schneider v. District of Columbia, supra,* the court said at *p.* 716 of 117 *F. Supp.*:

These extensions of the concept of eminent domain, to encompass public purpose apart from public use, are potentially dangerous to basic principles of our system of government. And it behooves the courts to be alert lest currently attractive projects impinge upon fundamental rights. The reasoning upon the point begins with the basic concept of natural rights and of property as one of those rights. To secure those rights governments were instituted, says the Declaration, and to secure them governments may impose limitations upon them; moreover, by clear implication the Fifth Amendment authorizes the taking of private property for public use. But here is the end of government power. That the Government may do whatever it deems to be for the good of the people is not a principle of our system of government. Nor can it be, because the ultimate basic essential in our system is that individuals have inherent rights, and as to them the powers of government are sharply limited. There is no general power in government, in the American concept, to seize private property. Hence it is universally held that the taking of private property of one person for the private use of another violates the due process of law clauses of the Fifth and Fourteenth Amendments. The reasoning which applies to this right is the same as that which applies to other rights guaranteed by the Constitution.

Again, at p. 724:

But as yet the courts have not come to call such pleasant accomplishments a public purpose which validates Government seizure of private property. The claim of Government power for such purposes runs squarely into the right of the individual to own property and to use it as he pleases. Absent impingement upon rights of others, and absent public use or compelling public necessity for the property, the individual's right is superior to all rights of the Government and is impregnable to the efforts of government to seize it. That the individual is in a low-income group or in a high-income group or falls in the middle of the groups is wholly immaterial. One man's land cannot be seized by the Government and sold to another man merely in order that the purchaser may build upon it a better house or a house which better meets the Government's idea of what is appropriate or well-designed.

And again at *p.* 720:

It is said that the established meaning of eminent domain includes measures for the "general welfare" and that new social doctrines

have so enlarged the concept of public welfare as to include all measures designed for the public benefit. The difficulty lies somewhat in the unqualified philosophical declaration, but it lies more in the practicality that some person or persons must determine, if that be the rule, what is the public benefit. Therein lies the insuperable obstacle, in the American view. There is no more subtle means of transforming the basic concepts of our government, or shifting from the preeminence of individual rights to the preeminence of government wishes, than is afforded by redefinition of "general welfare", as that term is used to define the Government's power of seizure. If it were to be determined that it includes whatever a commission, authorized by the Congress and appointed by the President, determines to be in the interest of "sound development", without definition of "sound development", the ascendancy of government over the individual right to property will be complete. Such ascendancy would logically follow over the rights of free speech and press, it seems to us.

· In *Cannata v. City of New York, supra,* Judge Van-Voorhis said in his dissenting opinion at *p.* 908 of 227 *N. Y. S.* 2d, at *p.* 399 of 182 *N. E.* 2d:

It might be thought, perhaps, that in the march of progress there is no limit to the power of the Legislature even short of authorizing municipal officials to determine, through zoning or eminent domain, who shall be permitted to own real estate in cities and to what purpose each separate parcel may be devoted. The sound view is still, however, that due process includes substantive as well as merely procedural limitations and that under the mores of the day there are substantive limits to what municipalities can do with private property, even by means of statutes enacted under the spur of single-minded city planners imbued with evangelistic fervor. At some stage the rights of private property owners become entitled to be respected, even if their use of their properties does not coincide with the ideas, however enlightened, of the *avant garde.*

Neither the United States Supreme Court in *Schneider* nor the majority in *Cannata* disavowed the foregoing excerpts.

It becomes necessary to assay the testimony in the light of the foregoing. The facts adduced demonstrate that the statutory test for a declaration of blight has not been met and that the municipality's action was unreasonable and constituted an abuse of discretion. The evidence discloses that the section of the township here involved, of an area

of approximately 122 acres, was plotted into some 480 residential building lots in 1911. Additionally there is a 17 acre unmapped plot in the section. The major portion of the lots were thereafter sold to the public. Although there were subsequent resales of individual lots, out of 26 acres of delineated streets, but one was actually laid out on the ground and improved. The balance are "paper" streets. Only 18 dwelling units scattered mostly through the periphery of the section have been constructed. Quite patently, the 1911 residential development was premature and the anticipated improvement of lots failed to materialize. The land continued to lie idle and unimproved. The reason for the lack of utilization of the lots was compounded by the municipality, prior to 1962, in adopting a zoning ordinance which restricted the use of the land to residential purposes—again a use for which there was no demand. There is no proof, nor was it even contended that this so-called lack of utilization, antedating the year 1962, was attributable to a "condition of title [and] diverse ownership of the real property." The actual reason for the area lying fallow from 1911 to 1962 is to be found in the fact that there was no demand for residential property. Approximately two-thirds of the entire municipality remains in a similar undeveloped condition. The lack of demand for the commodity rather than a title problem or divers ownership, caused the land to remain unimproved at least until 1962. Not until 1962 was the zoning ordinance amended to include the area here involved within a "regional business" zone and to *exclude* use for residential purposes. Thus, the municipality recognized and determined for the first time in 1962 that the "proper utilization" of the area was for commercial rather than residential purposes. It is conceded that there now exists a prime demand for said land for use as a regional shopping center. The municipality agrees that the land has such a potential, that it is properly and commonly now referred to as the "Golden Triangle." It is the alleged lack of actual use for the erection of a

regional shopping center which the municipality seeks to make the basis for a blight declaration. The inception of any alleged lack of "proper utilization" for that purpose upon which to bottom a finding that a "stagnant and unproductive condition" of the land existed must post-date 1962 as only since that date has the municipality permitted that type of utilization.

Additionally, the area was not suitable as a regional shopping center until it became accessible to motorists from large centers of population by construction of Interstate 287 which was opened to traffic in 1964-1965. Some time between 1962 and 1964—the former being the date of initial availability of the area for regional shopping use under the zoning ordinance, and the latter being the genesis of actual physical accessibility of the area to the public, private capital became interested in the development of shopping centers and commercial businesses in said area and undertook to assemble land for that purpose. In this undertaking they were reasonably successful as is hereafter shown. The price paid for land more than tripled between 1964 and 1967, going from $7,000 per acre to a sum in excess of $25,000 per acre.

In 1965, Louis Schlesinger Company (Schlesinger), an agent of Vornado Inc. (Vornado) (Two Guys retail store), made an offer to defendant municipality to purchase the lands owned by the township in the area, for development as a shopping and civic center. These lands encompass over 47 acres and together with mapped streets, represent 60% of the land in this section. The proposal contemplated a consideration of $600,000 for the purchase and an immediate construction expenditure of $3,000,000. The offer was rejected after receipt of an advisory letter from Herbert H. Smith Associates (Smith Associates), planning consultants, who subsequently determined that the area was blighted. The letter, dated August 17, 1965, reads in part:

The proposal that the Schlesinger Company acquire the properties involved privately, without recourse to Township Participation under the New Jersey Redevelopment Statutes, should be studied in detail. While it might be preferable for the redevelopment not to require municipal financial involvement, this *would only be true if all other benefits to the Township were equal.* Problems in acquiring all properties desired may develop if the Township is not involved, but perhaps *more important is the control which the Township would have over the project and the financial return to the Township for the property it now owns. It would seem that these properties would take on substantial additional value if assembled into a single tract.* This additional value would have to be measured against the cost of acquisition, including legal and administrative costs of acquisition of the remaining properties. From the standpoint of the Township control of the project, if the Township is not involved in acquisition, it can only regulate the project through the Zoning and Subdivision Ordinances. *However, with involvement, it could add to these regulations any further conditions which appeared reasonable and desirable through the sales agreement and deed restrictions.*

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

The Schlesinger proposal involves a "two Guys" unit of 115,000 sq. ft. as the primary initial developer on the site. While the stature of this organization has grown somewhat in recent years, it is *not the type and quality of department store* which I had hoped to see located in this area. It has always been my hope that the site would be capable of attracting a department store unit which would be of a type and quality which is not now available in the area, and in doing so would attract business which is now going outside of the area. "Two Guys" would, in my opinion, merely attract business which is not supporting the Somerset Shopping Center, stores in Somerville, and such establishments which are now found along Route 22 in the immediate area.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

At the same time, the Township should retain a qualified real estate appraiser to provide a report which would determine the following questions: (1) the market value of the present Township lands: (2) the likely acquisition cost of the lands not held by the Township; and (3) the market value of the overall tract once assembled. This information is basic to a determination of whether or not *it would be best, from the Township's point of view,* to proceed as suggested by the Schlesinger Company, or *as an alternative, to proceed with Township acquisition* and subsequent re-sale to Schlesinger and Vornado. (Emphasis supplied)

Thereafter, early in 1966, Milton Wollman, an agent of R. H. Macy & Co. — Bamberger (Macy), department store entrepreneur, having acquired title to a number of properties

from private individuals, made an offer to the municipality to purchase its lands for a consideration of approximately $621,000 with the objective of constructing a shopping center. The municipality tentatively accepted the offer subject to conditions and pursuant to *N. J. S. A.* 40 :60–26, scheduled a hearing to finally consider said offer. Contending that the offer had been tailored to Macy's specifications, the present plaintiffs filed a suit contesting the sale. The municipality withdrew its acceptance of the Wollman offer prior to trial of that issue. The withdrawal was not nor is it now stated to be grounded on inability to convey title. The reason given in the municipality's brief is that plaintiffs "successfully attacked its legality." It is noteworthy that Wollman who assembled the land for the Garden State Plaza at Paramus — encompassing 110 acres, testified that neither the paper streets nor alleged conflicting title presented a hindrance to a development of the area. He stated that he was and is willing and satisfied to accept the municipal title, having searched the title. Wollman has also been active in other land assemblages for regional shopping centers.

In October 1966 the Planning Board adopted a master plan, also prepared by Smith Associates, which recommended that the most logical use of the area *sub judice* would be as a regional shopping center. In November 1967 in response to a request from the municipality as to "the best method of assuring the proper development" of a regional shopping center in the Golden Triangle area, special counsel advised that the "blight" method, *N. J. S. A.* 40 :55–21.1 (e) offered an orderly and controlled means for development of the territory as a unit. The resulting power of condemnation, said counsel, would permit the preservation of space for "municipal * * * uses and assure the Township of the *highest return on the sale of its property,* through the instrumentality of a subsequent *unadvertised and private sale.*" (Emphasis supplied). Smith Associates on August 17, 1965 in analyzing the Schlesinger proposal, as above noted, also stressed that employing the blight tactic would

have the effect of increasing the "financial return to the Township for the property it owns" (lands which both Schlesinger and Wollman had theretofore sought to purchase). "It would seem that these properties would take on substantial additional value if assembled into a single tract."

On December 4, 1967, the Township Committee adopted a resolution directing the Planning Board to undertake a preliminary investigation as to whether the area was blighted. The directory resolution recited its predetermination of the existence of blight and the suggested result of such an investigation, as follows:

WHEREAS, *there exists* in a section of the Township of Bridgewater, bounded by U. S. Routes 202–206, Eighth Avenue, Interstate Route 287, North Bridge Street and U. S. Route 22, *a lack of proper utilization* of the area *caused by he condition of the title, diverse ownership of the real property therein and other conditions, resulting in a stagnant and unproductive condition* of land potentially useful and valuable for contributing to and serving the public health, safety and welfare * * * (Emphasis supplied)

Frank W. Dittman, a member of the Township Committee, who was Mayor at the time of the blight hearings, testified that the object of the township committee was to obtain a "good, high quality store"; that he was aware of the continued interest of private developers in acquiring land and building in the area and that several were purchasing and assembling property for that purpose even during the blight hearings.

The Planning Board admittedly based its conclusion of "blight" upon the investigation and report of Smith Associates. It was disclosed upon examination of Carl G. Lindbloom, Director of Urban Design and Renewal, of Smith Associates, who supervised the investigation and preparation of the report, that the information concerning the conditions of title and divers ownership was obtained from the Bridgewater Tax Assessor — an unreliable source — and not from a title search. Actually, no final title search of the County Clerk's records had been received by the municipality by

October 1969. No opinion was obtained as to the feasibility, expense or time required to clear title to any lot, a title to which was alleged to be doubtful. No inquiry was made of anyone as to the feasibility of a developer acquiring title to any of the property in private hands. None of the known owners were interviewed to ascertain whether they would sell and if so for what consideration. To the contrary, Wollman testified that he had received no refusals to sell. Those who had a willingness to purchase and develop were not interviewed. All of the conclusions contained in the Smith Associates report, in the foregoing respects were based upon speculation without any factual support.

The schedule of ownership included in the Smith Associates report, compiled from information obtained from the Tax Assessor, discloses:

| OWNERSHIP | ACRES | | PER CENT OF TOTAL |
|---|---|---|---|
| Streets | 26.21 | | 21.47 |
| Township Owned (Exc. of lots claimed by Township but on assessment rolls) | 47.64 | | 39.03 |
| Private Owners: | 44.22 | | 36.23 |
| Wollman | | 14.48 | |
| Bridgewater Leasing | | 5.05 | |
| Atria | | 5.18 | . |
| Chandler | | 1.68 | |
| Elks | | 2.46 | |
| Other Owners | | 15.37 | |
| Unknown | 3.99 | | 3.27 |
| TOTALS | 122.06 | | 100% |

Why streets should be catalogued as property owned is not clear as title to the bed of the streets is vested in abutting owners and cannot be conveyed separate from a conveyance of title by the abutting owner. However, accepting these figures as accurate, they disclose that the title to 81.36% of the acreage, including streets, is vested in five owners (Wollman and Bridgewater titles are now combined); 15.37% is vested in 55 parties and 3.99% is vested in "un-

known owners" — whatever that means. Surely, the ownership of 94.73% by 60 owners furnishes no basis for a finding that title is held by "divers" owners.

Except for the "unknown" owners who, according to Smith Associates, constitute 3.99% of the acreage, the principal thrust of the faulty "condition of title" is directed by the municipality at its own holdings. The record discloses the peculiar spectacle of the municipality denigrating its own title as an apparent excuse for not selling and as an additional item to bolster its proof that there are faulty titles in the area which contribute to a lack of utilization thereof because of the unmerchantability of the land due to condition of title. This proof it submits in the face of the fact that (1) in 1965 an offer was made to the municipality by Schlesinger for these holdings for $600,000 and an agreement to spend $3,000,000 on improvements; the offer was rejected by the municipality not because of the status of its title, which the offerer was satisfied to accept and is presently satisfied to accept, but because the purchaser was not the "type and quality department store" which it desired to have operated in the Golden Triangle; (2) in 1966 the municipality accepted an offer from Wollman to purchase its holdings, but subsequently reneged and withdrew its acceptance. The acceptance was withdrawn not because of the status of its title, which the offerer was willing to accept, but because of the suit which successfully contested the validity of the sale conditions on the ground that the conditions were tailored so as to exclude Vornado from bidding; (3) Vornado and Levin have expressed a willingness and continue to express such willingness to purchase the municipal lands and are presently willing to purchase and develop said lands for use as a regional shopping center. The *bona fides* of this offer are not questioned nor is the experience, capacity and ability of Levin to finance and construct a shopping center disputed. Levin is an admittedly sophisticated shopping center entrepreneur, having financed and constructed over 100 shopping centers along and adjacent to the eastern coast from Ver-

mont to Florida. Had the municipality made its lands available for purchase there would now exist no lack of utilization.

That the municipality has the discretionary right to refuse to sell its real estate holdings is indisputable. However, it may not exercise this discretion to refuse to sell said holdings in order to use the resulting lack of utilization of the area as a ground to obtain the power of condemnation of adjoining lands. It is plain that the municipality has chartered a course directed at wresting the power of purchase, sale and control of operation through the instrumentality of a blight declaration, from private enterprise and capital so that it may itself be vested with these powers. What the municipality has here contrived is a means to seize title not in order that dormant land may be utilized but to obtain additional value for its presently owned lands and to direct who shall conduct the merchandizing business to be conducted on the lands so seized. Restated, what the municipality seeks is to dictate the merchandizing methods, manners and practices to be observed and followed by the operator of a shopping center. It is plain that what it wants is a more "exclusive" department store than it anticipates plaintiffs will operate. So employed, the municipal action is a perversion of the statute. The purpose of the statute is to force the development and use of property, not to furnish control over the means of development and the method of discharging the use for which it was developed.

It is to be noted that the municipal zoning ordinance mandates only 10 acres for the purpose of establishing a shopping center. There is no testimony of the immediate need of the entire 122 acres for use as a regional shopping center. To the contrary, it is undisputed that there is no immediate demand for such a large area and that the development of the entire section as a regional shopping center will of necessity consume a period of years.

As an additional reason for a blight declaration defendants argue that such a declaration is necessary so that

eminent domain may be employed to clear the titles. Aside from the fact that the statute was not enacted for this purpose, there is no necessity to proceed by condemnation to remove a cloud upon title. The alleged faulty titles ensuing from municipal tax foreclosure, titles of unknown owners, and any other questionable titles, could have long since been cured and can yet be cured in a normal accepted proceeding, *i. e.*, either suit to quiet title or a new strict or *in rem* foreclosure. But says the municipality, even recognizing that these other remedies are available and that the same title searches would be required for condemnation as for any of the other foregoing suggested curative measures, the same parties defendant would have to be joined and served in either event, the condemnation proceeding is preferable because title can be positively obtained and possession can be obtained more expeditiously. This, says the municipality, results because condemnation prevents an establishment of title or redemption by a true owner and thus succeeds in eliminating the real owner from establishing and retaining his title. This statement discloses another of the ulterior purposes of the blight proceeding not encompassed in the statute. *N. J. S. A.* 40:55–21.1 is not concerned with furnishing an alternative remedy to presently existing remedies available to private or corporate persons to clear title, nor a substitute for a tax foreclosure. Use for any of such purposes constitutes a perversion of the statutory proceeding and an abuse of discretion.

The foregoing analysis of the evidence demonstrates that not only is the municipal declaration of blight not "supported by substantial evidence," *Lyons, et ux, et al, v. City of Camden, et al,* 52 *N. J.* 89, 98 (1968), but to the contrary, the record discloses an absence of the statutory criteria upon which such a declaration of blight may be bottomed. Private capital has and is continuing to assemble title to lands privately held in spite of the dog-in-manger attitude of the municipality. After two short years, 1965-1967, of such private assemblage, the munici-

pality has undertaken a proceeding for a blight declaration which is certainly a retardant rather than a stimulant for the expenditure of money for private development. No compelling community economic need has been shown here to warrant the exercise of the power of eminent domain. See *Redevelopment Agency of City, etc. v. Hayes, supra,* 266 *p.* 2d at *p.* 116. The municipality has exhibited a clear intent to frustrate private development of the Golden Triangle. Additionally, there can be no doubt, that the municipality is attempting through a declaration of blight, to accomplish purposes other than an elimination of an alleged "stagnant and unproductive" condition. Accordingly, the declaration of blight is arbitrary, capricious and unreasonable and constitutes an abuse of the municipal discretion. I would reverse.

Justice SCHETTINO joins in this dissent.

*For affirmance* — Justices JACOBS, FRANCIS and PROCTOR —3.

*For reversal* — Justices HANEMAN and SCHETTINO—2.