Appellant City of Birmingham appeals from a lower court judgment granting appellees' prayers for declaratory and injunctive relief and ordering the City of Birmingham to grant appellees' petition for rezoning their property. We affirm.
Appellees, Dewayne N. Morris and Jo T. Morris, own two adjoining lots located at 2915 and 2931 Clairmont Avenue, Birmingham, Alabama. At the time this suit was initiated, the property was classified for zoning purposes as R-6 (Multiple Dwelling Residential).
In late 1979 appellees began their effort to change the zoning classification of their property from R-6 to B-1 (Neighborhood Business). This effort was based upon appellee Dewayne Morris's desire to use the property as a future site for his law offices. Appellees first sought approval of their plan before the Highland Park Neighborhood Association. The plan submitted to the Association called for a change to O-I (Office and Institutional) classification. After an initial vote in favor of the plan, the Association at a later meeting voted unanimously against it.
Following disapproval by the Association, appellees petitioned the Birmingham Planning and Zoning Commission and the Birmingham City Council to change the zoning classification of their property from R-6 to B-1. The Commission conducted an initial factual investigation of appellees' petition, after which it recommended against the proposed change. The City Council, upon considering the same information, agreed with the recommendation of the Commission, and denied the petition.
On January 29, 1980, appellees filed their complaint in Jefferson Circuit Court seeking declaratory and injunctive relief alleging that the Council's action in denying the requested zoning change was arbitrary, capricious and unlawful; bore no relationship to the health, safety, morals or general welfare of the City; and constituted an unconstitutional confiscation of appellees' property. After hearing evidence ore tenus, the trial court concluded that the issue of whether to rezone the appellees' property was not "fairly debatable" (citing City of Birmingham v. Norris, 374 So.2d 854 (Ala. 1979)). It, therefore, enjoined the City from enforcing its zoning ordinances as they affect the appellees' property, and ordered the City and its Council and its agents to approve the appellees' petition for the construction of an office building under B-1 zoning. The City of Birmingham appealed.
The factual evidence adduced at trial essentially involved testimony concerning the highest and best use of appellees' property and the character of the surrounding neighborhood. The property is located on the south side of Clairmont Avenue near the intersection of 29th Street and Clairmont. The property is located on the borderline of an R-6 zone where that zone interfaces with a B-2 (General Business) zone. A Standard service station lies directly west of the appellees' property on the southeast corner of 29th and Clairmont. Excluding that service station, the south side of Clairmont east of 29th Street is devoted entirely to residential uses. By contrast, the north side of Clairmont is entirely commercial *Page 55 
except for one apartment building. Clairmont Avenue itself is a fairly busy street, accommodating approximately 20,000 cars per day. Nevertheless, several zoning experts testified that Clairmont, with its landscaped median and high curbs, provides a fairly effective visual and sound screen between the commercial uses to the north and the residential uses to the south.
All of appellees' witnesses testified that the highest and best use of appellees' property would be an office building. These witnesses testified that the service station west of the property needed a "buffer" between it and the residential uses on the south side of Clairmont. An office building was believed to be a particularly effective buffer between an intense commercial use and a residential use. Witnesses for the City similarly testified that an office building would provide a reasonable buffer between a service station and residential property.
The City called various witnesses who testified that it would be economically feasible for appellees to construct an apartment building on the property in accordance with its R-6 classification. In addition, several witnesses testified that the erection of an office building would generate an excessive amount of additional traffic, thereby compounding the problem already created by the service station.
In the recent decisions of Jefferson County v. O'Rorke,394 So.2d 937 (Ala. 1980), and Cale v. City of Bessemer [1980],393 So.2d 959 (Ala. 1980), the Court reiterated its abiding adherence to the rule of law that a trial court must not disturb the zoning decision of a duly constituted municipal body so long as that decision is based upon a "fairly debatable" rationale. A zoning determination is said to be fairly debatable "when for any reason it is open to dispute or controversy on grounds that make sense or point to a logical deduction that in no way involves its constitutional validity,"Miami Beach v. Lachman, 71 So.2d 148 (Fla. 1953), or where the evidence provides a basis for a fair difference of opinion as to the application of the determination to particular property. See generally, 1 R. Anderson, American Law of Zoning, § 3.20 (2nd ed. 1977).
By virtue of this "fairly debatable" rule, the role of the judiciary in zoning cases is extremely limited and the dimensions of judicial review are narrowly confined. 4 E. Yockley, Zoning Law and Practice § 25-2 (4th ed. 1979); 4 R. Anderson, American Law of Zoning § 25.26 (2nd ed. 1977). Courts must recognize that zoning is a legislative function committed to the sound discretion of municipal legislative bodies, not to the courts. Waters v. City of Birmingham, 282 Ala. 104,209 So.2d 388 (1968); Marshall v. City of Mobile, 250 Ala. 646,35 So.2d 553 (1948). As a result, local governing authorities are presumed to have a superior opportunity to know and consider the varied and conflicting interests involved, to balance the burdens and benefits and to consider the general welfare of the area involved. Episcopal Foundation of Jefferson County v.Williams, 281 Ala. 363, 202 So.2d 726 (1967); Leary v. Adams,226 Ala. 472, 147 So. 391 (1933). They, therefore, must of necessity be accorded considerable freedom to exercise discretion not diminished by judicial intrusion. Walls v. Cityof Guntersville, 253 Ala. 480, 45 So.2d 468 (1950). Nevertheless, this discretion is not unbounded, and local authorities may not, under the guise of legislative power, impose restrictions that arbitrarily and capriciously inhibit the use of private property or the pursuit of lawful activities. When such arbitrary and capricious action is made apparent, a reviewing court will not hesitate to disturb the zoning determination as a clear abuse of discretion.
We believe the instant case is indicative of an increasingly common situation where affirmative governmental action, in permitting the construction of nonconforming uses, has effectively frustrated the planned use of residential property. In 1970, the City Counsel of the City of Birmingham approved a requested zoning change for the premises located immediately west of the appellees' property, notwithstanding the recommendation of the Planning and Zoning *Page 56 
Department to the contrary. By virtue of this action, the zoning classification of that property was changed from R-6 to B-2, thereby permitting the construction of the Standard service station presently located on the property. When questioned about this reclassification, Horace Carson, Zoning Controls Supervisor of the City of Birmingham, testified as follows:
 "Q Uh huh. Now, in 1970, when the City rezoned the corner lot sitting on the southeast corner of 29th and Clairmont, did you investigate that zoning application?
"A Yes, sir.
"Q And were you on — did the staff investigate it?
"A Yes, sir.
 "Q What was the recommendation of the staff on that occasion for that zoning?
 "A The concluding paragraph of the recommendation that is dated March 17, 1970 in regard to the rezoning of the Southeast corner of Clairmont Avenue and 29th Street was, and I quote:
 "`The staff of the Planning and Zoning Department advises that this request be not recommended to the City Council. The establishment of a service station on the corner of this intersection would significantly add to traffic congestion and would increase the danger to children attending the elementary school. [i.e., Lakeview School located on southwest corner of 29th and Clairmont].'
 "Q Now, has your views changed in light of events since 1970 for residential uses on the southside of Clairmont?
"A No, sir.
"Q They are still the same?
"A That is correct."
In addition, William Moody, Senior Planner with the City of Birmingham, testified that the existence of the service station in the R-6 zone violates the City's current Future Land-Use Plan for the Clairmont Avenue district. This land-use plan contemplates, among other things, upgrading the residences from R-6 to R-3 (Single Family) and R-4 (Two-Family), and maintaining the area for medium to high density residential. Mr. Moody testified as follows:
 "Q Does that violate the Long-Range Use Plan? Does this service station next door to Mr. Morris' property violate Birmingham's Long-Range Use Plan?
 "A At the time it was rezoned it constituted an amendment to the comprehensive plans which did not at that time indicate any non-residential use south of Clairmont Avenue. However, subsequent to the rezoning, City Council has reconfirmed the Planning Commission's recommendation for the future land use of that area to be medium to high residential density, which is not consistent with the existing zoning or the existing use of that service station. But it is later intent for future development.
"Q Was your answer yes or no?
 "A My answer is that the existing use is not consistent with the plan of the City of Birmingham.
 "Q Okay. Not consistent. I guess that would say that it violates the plan, is that correct?
"A I guess it violates the plan."
It is without question that the commercial development of the property west of appellees' premises has had a deleterious effect on the usefulness of their property for residential purposes. Although there is conflicting testimony concerning the desirability and feasibility of utilizing the subject property under its current R-6 classification, the witnesses generally agree that the construction of an office building on the property would enhance the neighborhood by providing a natural "buffer" between an intense commercial use (i.e., the service station) and the remaining residential uses along the south side of Clairmont; however, those experts called to testify for the City, while recognizing the plausibility of using an office structure as a buffer, strongly objected to reclassifying the property to B-1 zoning which would permit not only the construction of an office building, but also such nonconforming uses as a neighborhood convenience store or an additional service station. *Page 57 
We find it significant that in seeking the requested zoning change for their property appellees have repeatedly stated their limited intentions for developing the property. As we interpret the decree of the court, these statements and declarations are binding upon appellees, limiting the appellees' future development of the property under its new classification. In their appearances before the Highland Park Neighborhood Association and in their formal application to the Birmingham Planning Commission, appellees have asserted that they intend to use the property for the sole purpose of erecting a professional office building. Preliminary drawings of the proposed structure were submitted with the application. In addition, at the close of the City's evidence, Mr. Morris offered additional rebuttal testimony reiterating his intended use of the property. During that testimony, very significant statements were made:
 "Q Okay. Have your plans during the entire period of time that this case has been pending been to build a professional office building?
 "A Yes, it has from the first time I appeared before the Highland Park Neighborhood Community, and all the processes of appearing there, three times I believe, and before the Zoning Board, the one that does the recommendations, the Zoning Advisory Committee. The same plan that was presented to the City Council and it is the plans that we have got here in court. That's the only plans I have is to build that office building. However, I have really not been able to get the financing arranged and I don't know. At the time we started I had ten per cent financing when I first made the application and now we have got fourteen or fifteen per cent financing.
 "All I want to be able to do is to be able to use that property for this office building. Maybe eight thousand feet instead of ten thousand feet. But an office building next to that service station. Or if the economy stays like it is or the interest rate gets so high I can't do it, I would like to be able to use those two houses to convert them to offices, if that proves to be debatable — I mean if that proves to be feasible.
 "I don't have any other plans for that other than those two plans, and the Court can rely on that representation.
 "Q Would you have any objection to the Court drafting a decree?
 "A I have no objection for the Court drafting a decree allowing the construction of an office building.
 "MR. WALKER: Now, we object to the decree that the Court would draft.
 "THE COURT: I will allow him to state that. He can state it in his brief if he wants to. I am not bound by anything he says. Go ahead.
 "A I would like to have the permission to use it either way that I find is economically feasible to use it. Either convert the old houses into offices or tear them down and build an office building there. I would like one day to have my offices there. But until we get the rezoning, we can't get a construction price. Nobody will talk about what they will build a building for when I don't even have the rezoning for it.
 "I need another tenant to go in there and share the offices with me and I can't talk to any tenants about whether they want to come or not until I get the zoning. It all boils down that you can't do anything until you get the zoning.
 "THE COURT: I am not bound by any statements that the witness makes with regard to his intentions in the future situations but he is bound by them.
 "Q But you have no objection to the Court entering a decree that would prevent any other use other than this professional office building, is that correct?
 "A That's right. No objections. I would prefer that the Court frame it in the alternative to use it for offices, either the existing buildings or build a new office building there. I don't want to use it for anything else. I want to hold that property. I think it is a good piece of property and eventually will be zoned whether it is now or later.
 "THE COURT: When I get to that point in my deliberation and decide to *Page 58 
write a decree in your favor you will be bound by what you have stated.
"THE WITNESS: Yes, sir, I understand that."
On the basis of all the evidence, we find that the trial court could properly conclude that it was no longer "fairly debatable" that appellees' property be rezoned to permit the appellees' proposed use for construction of an office building. The trial court expressly limited its determination on this point by specifically ordering the City of Birmingham to approve appellees' petition for the construction of an officebuilding under B-1 zoning.
We, therefore, hold that the trial court, in recognition of the decision of this Court in City of Birmingham v. Norris,374 So.2d 854 (Ala. 1979), correctly applied the law to the facts. Furthermore, an appellate court will not ordinarily disturb the exercise of discretion by courts below in cases involving decisions of administrative bodies. 73 C.J.S. PublicAdministrative Bodies and Procedure § 252 (1951). The lower court judgment is, therefore, due to be affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.