Tutwiler Drug Company filed an action for a declaratory judgment against the City *Page 460 
of Birmingham, its mayor, and its city council members to determine the validity of a resolution adopted by the Birmingham City Council for the redevelopment of Block 60 in downtown Birmingham. Tutwiler's complaint alleged that the City and its agents deprived it of rights and privileges secured by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution in adopting the resolution. It sought to have the resolution declared invalid and to recover damages under 42 U.S.C. § 1983 and attorney's fees under 42 U.S.C. § 1988. The trial court dismissed the action against the mayor and the city council members individually. Following the entry of a Rule 54 (b), A.R.Civ.P., order, an appeal was taken to this Court, which affirmed the trial court's order. TutwilerDrug Co. v. City of Birmingham, 418 So.2d 102 (Ala. 1982). After remand to the trial court, a hearing was conducted on the merits. The trial court ruled that the resolution in question was invalid and awarded Tutwiler $40,000.00 in damages and $105,798.50 in attorney's fees. The City of Birmingham appeals.
 The Facts
In 1979 the City of Birmingham undertook studies of land-use surveys and census data pertaining to downtown Birmingham, which culminated in the adoption of a Community Renewal Plan on September 11, 1979. The Community Renewal Plan was a generalized plan identifying areas in Birmingham which needed revitalization. Block 60, which lies between 4th and 5th Avenues North and 19th and 20th Streets, was within an area identified by the Community Renewal Plan as needing revitalization.
The City selected the joint venture of Costa and Demetriou to act as urban planning consultants in developing a Master Plan for the redevelopment of downtown Birmingham, an area circumscribed by the Red Mountain Expressway, Highland Avenue, Interstate Highway 65, and 11th Avenue North. Costa and Demetriou prepared a land-use map of the downtown area and made a survey of the physical characteristics of the buildings within the survey area and the uses to which the buildings were being put. Each building was classified as either sound, deteriorating, or dilapidated. Data regarding the uses of the various buildings, the capacity of existing traffic arteries and parking facilities, the existing market for goods and services, and demographic trends were collected.
In February of 1980 the consultants submitted an "Early Program of Action" to the city. Among other things, the plan provided for the construction of multi-use structures containing retail and residential units along 19th Street North, including the west half of Block 60. It also called for the construction of a major hotel adjacent to the First National-Southern Natural Building on the north half of Block 47 (the block immediately to the north of Block 60). A public presentation of the Early Program was made and the City Council adopted the plan. During the following June the city requested proposals from developers for implementing the plan.
During the early part of August 1980, First National Bank, which owned the site of the proposed hotel on Block 47, vehemently objected to the construction of a hotel on the parcel. On August 19, 1980, Costa and Demetriou advised the city that they had changed their recommendation with regard to the location of the hotel, and they recommended that it be placed on Block 60. The city's planners and its consultants took the position that locating the hotel on Block 60 in a major mixed-use development would have a greater impact on downtown than locating the hotel on Block 47. The relative advantages of placing the hotel on Block 60 and the belief that First National would eventually redevelop the north half of Block 47 even if it was not included in the redevelopment project led the city to decide to alter the plan with regard to location of the hotel. On August 26, 1980, the City Council passed a resolution designating Metropolitan Properties, Inc., as a developer with which the city would attempt to reach an agreement to redevelop Block 60. Development *Page 461 
of the project had to await completion and adoption of the Master Plan, however.
On March 24, 1981, the completed Master Plan was presented by the consultants to the Birmingham Planning Commission. The proposal to redevelop all of Block 60 was included in the plan which was presented to the commission. The Planning Commission approved the Master Plan and recommended it to the City Council for its approval. On May 5, 1981, the City Council held a public meeting to consider the Master Plan, and at that meeting it passed a resolution adopting the Master Plan as a comprehensive urban renewal and redevelopment plan for downtown Birmingham pursuant to Title 24, Chapters 2 and 3 (§§ 24-2-1
through 24-3-9), Code of Alabama.[1]
The consensus of the city's consultants participating in the master planning process was that the entire downtown area contained elements of blight. After adoption of the Master Plan, the city set out to find specific evidence of blight on Block 60. Inspectors from various city agencies, such as the Department of Inspection Services and the Fire Department, were instructed to conduct inspections of the buildings on Block 60 and to make reports of all defects found in the buildings. The Crime Analysis Section of the Birmingham Police Department made a report on crime statistics for Block 60. Data were compiled regarding the number and nature of businesses on the block, the physical lay-out of the improvements on the block, and the number of parking places. The data were given to a city planner, Larry Watts, who was charged with compiling and analyzing them. The city's legal staff used the data compiled by Mr. Watts in drafting a resolution to be presented to the City Council. The mayor and his aides reviewed the information compiled by the consultants and by the city's employees pertaining to Block 60 and recommended that the City Council adopt the resolution prepared by the city's legal staff providing for the redevelopment of the block. *Page 462 
On August 25, 1981, the City Council held a public hearing on the proposed resolution. Tutwiler's president attended the meeting and its attorney made a statement on its behalf. On September 8, 1981, the Council adopted Resolution #1119-81, which became the Redevelopment Plan for Block 60. The resolution set out specific elements of blight existing on Block 60. It pointed out that the block is divided into 20 separate lots owned by 22 people, that it had three vacant buildings, and that sixteen businesses had moved away from the block during the preceding six years. It stated that most of the buildings occupied 100% of their lots and that there was an underutilization of the upper floors on the block. The resolution detailed numerous violations of the fire, electrical, plumbing, building, and housing codes. It also stated that serious policing problems existed on the block, and it set out a list of the types of crimes committed there during the preceding four years. It stated that the blight on the block had developed over a number of years and that the blight was increasing at an accelerated rate. The resolution concluded that, because of the block's location and its deteriorating condition, the redevelopment of Block 60 was pivotal to the revitalization of downtown Birmingham as proposed by the Master Plan; that the redevelopment of the block would eliminate blight on Block 60 and would reduce blight, blighting factors, and the causes of blight in other parts of the downtown area as well. The resolution concluded that it was necessary and in the public interest for the city to redevelop Block 60.
Tutwiler then brought this action to determine the validity of Resolution 1119-81. Tutwiler accused the city of using the determination of blight as a "subterfuge" to unlawfully and illegally acquire its property interests. At the trial of the case Tutwiler painted a picture of Block 60 which was very different than the one evoked by the description contained in the resolution. Tutwiler pointed out that some of the city's oldest and most respected merchants, such as Smith Hardwick Bookstore, Action's Camera Shop, and Forbes Piano Co., to name only a few, were located on Block 60. The Goodyear Shoe Hospital had been in the same location on Block 60 for over sixty years, and several other merchants had been there over forty years. At the time the resolution was passed, over 95% of the available space on the block was occupied. Tutwiler argued that the buildings themselves were in excellent condition considering their age, and that they would be considered undesirable only in comparison with the very newest buildings in the downtown area. In support of its contention that the buildings on Block 60 were not deteriorated, Tutwiler introduced copies of the original reports made by the city's inspectors. The reports contained favorable comments about the condition of the buildings on the block.
 The Trial Court's Decree
The trial court issued a 17-page opinion containing detailed findings of fact. Much of the opinion deals with the city's use of the inspectors' reports. Several reports contained qualifying remarks about the conditions of the buildings. The building inspector and the housing inspector referred to the substandard conditions on Block 60 as "minor" problems necessitating only "minor repairs." The electrical inspector categorized the items on his list as "minor or easily repaired." He concluded that Block 60 was "in pretty good shape as far as its electrical work is concerned." The inspector from the Fire Department stated that none of the conditions he found were "eminent fire hazards." The data from the reports were incorporated into the resolution without including any of the qualifying remarks contained in those reports. The trial court found:
 "From a comparison of the testimony given by the various inspectors and the qualifying remarks which accompanied their reports to the staff of the Community Development Department with the data in the form in which it appeared in Resolution 1119-81, the only inference the court can draw is that the staff *Page 463 
intentionally misled the City Council as to the conditions actually existing on Block 60."
Based on the findings set out in the decree, the court ordered:
(1) that the city lacked the power under Chapter 2 to condemn Block 60 because Chapter 2 of Title 24 pertains to housing and residential neighborhoods, not business districts;
(2) that the actions of the City Council in adopting the resolution were arbitrary and capricious; and
(3) that the city was liable to Tutwiler for damages in the amount of $40,000.00 based on its claim under 42 U.S.C. § 1983.
In separate orders the court awarded the plaintiff attorney's fees in the amount of $105,798.50 under 42 U.S.C. § 1988 and ordered the city and its attorney to pay Tutwiler $7,175.00 in attorney's fees based on a motion for sanctions.
 Applicability of Title 24, Chapter 2, to Commercial Property
The trial court ruled that Title 24, Chapter 2, of the Code of Alabama 1975 is applicable only to predominantly residential property and that it does not authorize the city to condemn property used solely for business or commercial purposes. It pointed out that Chapter 2 is entitled "Housing" and that the emphasis throughout Chapter 2 "is on housing authorities, residential construction, and housing projects in general." The trial court concluded that since Block 60 was not a residential area and the proposed development was only marginally related to housing, Chapter 2 was inapplicable.
Tutwiler argues that redevelopment projects are intended to "stimulate residential construction," to "aid the production of better housing and more desirable neighborhoods," and to make possible a "more stable and larger volume of residential construction." Section 24-2-1 (a)(4), Code of Alabama 1975. Chapter 2 fails to state at any point that it is applicable to commercial areas and does not even mention the words "business," "commercial," or "merchants." Furthermore, inBrammer v. Housing Authority of Birmingham, 239 Ala. 280, 282,195 So. 256 (1940), this Court stated that "Housing Authority" statutes were intended to provide "a better quality of homes for a class of citizens of moderate means" and to eradicate "slum districts."
Chapters One, Two, and Three of Title 24 were enacted for the purpose of enabling Alabama and its subdivisions to take advantage of federal funds available pursuant to federal housing, redevelopment, and urban renewal acts. The housing authority statutes referred to in Brammer are now codified in Chapter 1 of Title 24. Chapter 1 was enacted to secure federal aid offered pursuant to the United States Housing Act of 1937,42 U.S.C. § 1401, et seq. Chapter 2 of Title 24, entitled "Redevelopment Projects," was passed in response to the Housing Act of 1949, 42 U.S.C. § 1441, et seq. Chapter 3 of Title 24 was passed in response to the 1954 amendments to the 1949 act providing for urban renewal projects, 42 U.S.C. § 1450, et seq.
Since Resolution 1119-81 proposed clearing Block 60 of its buildings and constructing new ones in their places, Chapter 2, which concerns redevelopment projects, contains the applicable standards. Since the Alabama statutes were enacted to implement federal legislation, we will examine the intent of the Congress in passing the federal acts in an attempt to determine what sort of property can be taken under the Alabama statutes for redevelopment projects.
As it was originally enacted in 1949, the federal housing act was applicable only to slum areas which were "predominantly residential in character" or areas which were "to be developed or redeveloped for predominantly residential uses." See Housing Act of 1949, July 15, 1949, ch. 338, Title I, Sec. 110 (c). The purpose of the 1949 act was to help remove the impact of slums on human lives rather than to redevelop or rebuild cities. Senate Report No. 84, February 25, 1949, Vol. 2, 1959 U.S. Code Congressional Service 1550, 1563. Although *Page 464 
the 1949 act was limited to development of primarily residential areas, the act was subsequently amended to broaden its scope. In 1954 the act was amended to allow slum clearance and urban renewal of areas which were not predominantly residential but which contained "a substantial number of slum, blighted, deteriorated or deteriorating dwellings or other living accommodations" where the areas were unsuitable for redevelopment for residential uses. Housing Act of 1954, August 2, 1954, ch. 649, Title III, § 311, 68 Stat. 626. The following year the 1949 act was again amended to broaden its scope. The 1955 amendment provided that land which was predominantly nonresidential in character could be developed for predominantly nonresidential purposes "if the governing body of the local public agency determines that such redevelopment for predominantly nonresidential purposes is necessary and appropriate to facilitate the proper growth of the community in accordance with sound planning standards and local community objectives and to afford maximum opportunity for the redevelopment of the project area by private enterprise." Housing Amendments of 1955, August 11, 1955, ch. 783, Title I, § 106 (c), 69 Stat. 637. In 1959 Congress again amended the 1949 act. The Housing Act of 1959 provided for nonresidential urban renewal and redevelopment if "the governing body of the local public agency determines that the redevelopment of such an area for predominantly nonresidential uses is necessary for the proper development of the community." September 23, 1959, Pub.L. 86-372, Title IV, § 413, 73 Stat. 675, 677. In 1961 the act was again amended to allow a larger percentage of federal redevelopment funds to be spent for nonresidential projects.
While the primary purpose of the federal statutes is to improve housing conditions, nonresidential property may be acquired for commercial and industrial renewal and redevelopment. Although the 1949 act did not provide for commercial or industrial projects, over the years it became apparent to the Congress that the "economic, institutional, and cultural bases of community life" are vital to the creation and existence of good homes in sound urban neighborhoods. In recognition of the fact that the construction of good neighborhoods was intimately tied to the economic health of the community, exceptions to the "predominantly residential" requirement of the 1949 act were added and the percentage of federal funds available for such projects was from time to time increased to reflect the growing attention to the needs for downtown renewal. Senate Report No. 281, Housing Act of 1961, Vol. 2, 1961 U.S. Code Cong. Admin. News at 1923, 1952-53.
While we agree with the trial court that the primary purpose of urban renewal and redevelopment statutes is the elimination of residential slums and the improvement of living conditions, the conclusion that only residential property can be condemned for redevelopment is unwarranted. There is nothing in the statute specifically limiting its application to residential areas. The federal acts on which Alabama's statutes were based clearly provide for the acquisition of commercial property for non-residential development. Non-residential development has previously been allowed under Alabama's renewal and redevelopment statutes. See Blankenship v. City of Decatur,269 Ala. 670, 115 So.2d 459, 460 (1959). The legislature many years ago determined that the problems of urban residential blight cannot be divorced from the problems of urban deterioration in general. It recognized that sound city planning often requires that rundown business districts be rehabilitated in order for urban residential districts to become attractive places to live. We therefore conclude that Chapter 2 of Title 24 is applicable to commercial and industrial property as well as to residential property.
 Validity of Resolution 1119-81
The decision by an appropriate body to undertake a redevelopment project is legislative in character and must be upheld by the courts unless it is shown that the decision was the result of arbitrary and *Page 465 
capricious action or was induced by fraud or was made in bad faith. Housing Authority of Roosevelt City v. Nunn, 292 Ala. 60, 288 So.2d 775, 776-77 (1974). The trial court found that the data compiled by the Community Development Department and provided to the city council in the proposed resolution were "either false or so out of context so as to be materially misleading." The court concluded that the city's employees intentionally misled the City Council as to the conditions on Block 60. As a separate and independent ground for its decision, the court also found that the resolution was arbitrarily and capriciously adopted.
We disagree with the trial court's conclusion that the resolution was induced by fraud. It does appear that the city employees charged with collecting data and drawing up the proposed resolution presented the data in a manner calculated to make the condition of the buildings appear as poor as possible. Even if we accept the trial court's premise that the description of the buildings in the proposed resolution was misleading, however, we cannot accept its conclusion that the resolution was induced by fraud. Both the chronology of the events leading up to the adoption of Resolution 1119-81 and the ample availability of information about the true conditions on the block from a wide variety of other sources belie the conclusion that the resolution was fraudulently induced by the misleading representations made by the city's employees.
Two years before Resolution 1119-81 was adopted, a Community Renewal Plan, which included Block 60 within the area targeted for revitalization, was passed. Four months before the adoption of Resolution 1119-81 the City Council approved the Master Plan, which provided for the redevelopment of Block 60. It was after the Master Plan, calling for the redevelopment of Block 60, was adopted by the City Council that the data in question were gathered. Coming as they did, after approval of the Master Plan, it does not seem reasonable to conclude that the alleged misrepresentations induced the City Council's adoption of the resolution. It appears that the decision to redevelop Block 60 had, in large part, already been made when the alleged misrepresentations occurred.
The impact of the city's data on the Council's ultimate decision must, we think, be viewed within the context of the other information available to the Council about the conditions on the block. The proposed redevelopment of Block 60 was an issue of considerable public debate in Birmingham. There was a great deal of attention devoted by the local media to the question of the redevelopment of Block 60 in general and to the question of locating a hotel on the east half of the block in particular. Block 60 is in a central location and it contained numerous businesses, with which anyone working in the downtown area, including members of the City Council, would probably have been familiar. Interested parties, including the plaintiff, presented testimony to the council about the block. Given the intense public debate associated with the redevelopment project, the highly visible location of the property, and the abundance of information about the true conditions on Block 60 available to the Council from numerous and diverse sources, it was purely conjecture on the trial court's part to conclude that the allegedly misleading data supplied by the community development department induced the adoption of the resolution.
It does not appear that the City Council acted fraudulently or in bad faith in adopting Resolution 1119-81. The Council did not, for instance, use the redevelopment statute as a pretext to oust some unpopular landowner or to benefit some private party. There was no evidence suggesting that the adoption of the resolution was not motivated by a desire to further the public good.
The trial court also found that the City Council's adoption of the resolution was arbitrary and capricious. In so finding, the court applied the "fairly debatable standard" as set out inJefferson County v. O'Rorke, 394 So.2d 937, 938 (Ala. 1981), and City of Birmingham v. Morris, *Page 466 396 So.2d 53, 55 (Ala. 1981). Under that standard, the City Council's decision to redevelop Block 60 should not have been interfered with by the courts so long as it was based on a fairly debatable rationale. The courts are, of course, required to be more than rubber stamps for the city governments. YonkersCommunity Development Agency v. Morris, 37 N.Y.2d 478,373 N.Y.S.2d 112, at 120, 335 N.E.2d 327, at 333 (1975). The statute sets out the factors to be considered and it is the court's role to insure that the city's decision took into account a consideration of those factors. City of Phoenix v.Superior Court of Maricopa County, 137 Ariz. 409, 671 P.2d 387,391 (1983).
Section 24-2-2 (1), Code of Alabama 1975, empowers cities to carry out redevelopment projects by acquiring "blighted areas." "Blighted areas" are defined as "areas, including slum areas, with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals or welfare of the community." Section 24-2-2 (1). Using the "fairly debatable" standard to test the validity of the resolution under § 24-2-2
(1), the resolution was valid if it was fairly debatable that Block 60 either (1) was a slum or (2) exhibited any combination of the blighting factors enumerated in the statute and that, as a result of the presence of those factors, the block was "detrimental to the safety, health, morals or welfare of the community."
In addition to the power to acquire blighted areas under §24-2-2 (1), § 24-2-2 (2) empowers cities to acquire "other real property for the purpose of removing, preventing, or reducing blight, blighting factors or the causes of blight." Section24-2-2 (2). Adoption of the resolution was justifiable under §24-2-2 (2), therefore, if redeveloping Block 60 would remove, prevent, or reduce blight, blighting factors, or the causes of blight.
Block 60 was clearly not a slum. Blankenship v. City ofDecatur, 269 Ala. 670, 675, 115 So.2d 459, 463 (1959), describes slums as "gathering places of filth, lust, crime, disease and degeneracy" where "people gather under the lowest possible standards of living, crowded together in dilapidated hovels which are unsafe, unsanitary and unhealthful" in a sordid atmosphere in which disease is spread; and where offspring born in such conditions are "damned, from the day of their arrival in this world, to the life of their fathers." Block 60 contained structures built during the early part of this century.[2] By contemporary standards they were not laid-out well. They were buildings of only a few stories which typically covered all or nearly all of their lots and housed primarily ground-level types of businesses. Their very low floor-area ratio and the decline in use of their upper floors generally amounted to an "underutilization" of the block in comparison to those blocks in the core area of downtown which contained more modern structures. Since the buildings were built prior to the proliferation of the automobile, no provisions were made for parking except on the street and on one lot where a building had been demolished. Most of the buildings had multiple violations of various building, plumbing, and fire codes. The violations were, for the most part, however, minor problems which could be corrected by regular maintenance and which posed no significant fire or health hazards. In short, as one of the city's inspectors pointed out, Block 60 was typical of much of downtown Birmingham.
Block 60 was distinguished not so much by its condition as by its location. Being in the center of the downtown area and being in the midst of new high-rise office buildings made it an ideal location for new construction. Furthermore, since the block was owned by twenty-two separate *Page 467 
owners, acquisition of the block by private developers without governmental assistance would have been more difficult than it would have been had there been fewer owners.
Although it was not a slum, Block 60 clearly exhibited several of the factors of blight enumerated in the statute, such as obsolescence, faulty arrangement or design, excessive land coverage, deleterious land use, and obsolete layout. Although the statute does not specifically mention diversity of ownership as a factor of blight, the statute provides that if any combination of the listed factors or "other factors" are detrimental to the "safety, health, morals or welfare of the community" the property may be redeveloped. If it inhibits needed redevelopment, diversity of land ownership may be considered a blighting factor. See Redevelopment Agency of SanFrancisco v. Hayes, 122 Cal.App.2d 777, 266 P.2d 105 (1954);Stahl v. Board of Finance, 62 N.J. Super. 562, 163 A.2d 396
(1960); Levin v. Township Committee of Bridgewater, 57 N.J. 506, 274 A.2d 1, 45 A.L.R.3d 1054 (1971).
Even though the statute is not limited to slum areas, the other cases before this Court dealing with the renewal and redevelopment statutes have all involved areas which could fairly be described as slums. In Housing Authority of RooseveltCity v. Nunn, 292 Ala. 60, 288 So.2d 775 (1974), the evidence showed that in the area of the proposed redevelopment there were cesspools, there were several abandoned homes, there were outhouses, and that livestock was kept within the area. InBlankenship v. City of Decatur, 269 Ala. 670, 675,115 So.2d 459, 463 (1959), the Court concluded from the pictures in evidence and the testimony that there was no question that most of the territory was a "slum area." Brammer v. HousingAuthority of Birmingham, 239 Ala. 280, 282, 195 So. 256, 257
(1940), does not discuss the condition of the structures in question. It does, however, refer to "`slum districts' or quarters."
Applying the redevelopment statutes to the facts of this case, and using the "fairly debatable" standard, we opine that there are at least three grounds on which the City Council's adoption of the resolution can be justified. First, Block 60 is part of a larger area which is blighted. The city's conclusion that the redevelopment of Block 60 as a part of the redevelopment of the downtown area would reduce blight in other areas of downtown Birmingham provided a justification for the resolution under § 24-2-2 (1). Second, notwithstanding the question whether Block 60 is "blighted," as that term is defined in § 24-2-2 (1), factors of blight clearly existed on Block 60 and it was fairly debatable whether the block was in a deteriorating condition. The redevelopment was justified, therefore, under § 24-2-2 (2) on the basis that the redevelopment of the block would prevent or reduce blighting factors or the causes of blight. Finally, there was a reasonable basis for the City Council to find that the buildings on Block 60 were obsolete, underutilized, and in the process of becoming blighted. Although Block 60 posed no direct threat to the health, safety, or morals of the community, it did exhibit several indicia of blight which the City Council could have found were detrimental to the welfare of the community within the meaning of § 24-2-2 (1).
Even if Block 60 was not blighted, it was part of a larger blighted area which was being redeveloped. A comprehensive plan aimed at eliminating blight in downtown Birmingham and at revitalizing the area was devised after careful study of the downtown area. The consensus opinion of the consultants participating in the studies culminating in the Master Plan was that the entire downtown area contained elements of blight which needed to be addressed and corrected and that the redevelopment of Block 60, along with the other downtown redevelopment, was consistent with the goals and objectives of the Master Plan. It is the condition of the entire redevelopment area as a whole, not the condition of the plaintiff's property, which determines whether redevelopment is warranted under the urban renewal and redevelopment *Page 468 
laws. Wilson v. City of Long Branch, 27 N.J. 360, 142 A.2d 837
(1958); Crawford v. Redevelopment Authority, 418 Pa. 549,211 A.2d 866, 869 (1965); Davis v. City of Lubbock, 160 Tex. 38,326 S.W.2d 699 (1959). The mere fact that some of the buildings in a redevelopment area are substantial and standard does not require their exclusion from the project. Blankenship v. Cityof Decatur, 269 Ala. 670, 115 So.2d 459, 463 (1959). Since the downtown area as a whole was blighted, it was proper to include Block 60 in the redevelopment of downtown Birmingham if it was reasonably necessary to do so in order to carry out the redevelopment plan, even if Block 60 itself could not properly have been considered blighted.
The city's decision to redevelop Block 60 could also be justified on the basis that it was necessary to redevelop Block 60 in order to prevent it from becoming blighted. There was ample evidence to support the conclusion that elements of blight existed on Block 60. Section 24-2-2 (2) authorizes the acquisition of property to remove or reduce blighting factors. Urban renewal and redevelopment statutes are not limited to perceptually offensive slums. Levin, supra, 57 N.J. 506,274 A.2d 1, 18 (1971). Once the process of blighting begins, cities may redevelop deteriorating areas in order to arrest the spread of blight and to prevent blight from occurring.
Finally, the City Council was justified in deciding that redevelopment was necessary because the presence of the blighting factors on Block 60 were detrimental to the general welfare of the community within the meaning of § 24-2-2 (1). There is no doubt that the underutilization of property in the core of the downtown area is detrimental to the welfare of the community in the broad sense of the term "welfare." Community redevelopment is an integral part of modern municipal government. Soundly planned redevelopment can make the difference between economic stagnation and a resurgence of healthy growth. Levin, supra, 57 N.J. at 540,274 A.2d at 19-20. We are aware that some courts have ruled (or have suggested) that redevelopment statutes cannot constitutionally be used to condemn property which poses no direct threat to public health, safety, or morals. See Apostle v. City ofSeattle, 70 Wn.2d 59, 422 P.2d 289, 292 (1966); Grubstein v.Urban Renewal Agency of City of Tampa, 115 So.2d 745, 750 (Fla. 1959); Regus v. City of Baldwin Park, 70 Cal.App.3d 968,139 Cal.Rptr. 196, 204-05 (1977); Schneider v. District ofColumbia, 117 F. Supp. 705, 719-720 (D.D.C. 1953). These cases were decided by courts which take a narrow view of what constitutes a "public use" for purposes of eminent domain, however. This Court has stated that the term "public use" should be given an elastic or liberal interpretation. Brammerv. Housing Authority of Birmingham, 239 Ala. 280, 195 So. 256
(1940). The role of the judiciary in determining whether the legislature is exercising its power for a public purpose is an extremely narrow one. Berman v. Parker, 348 U.S. 26, 32,75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). Courts should not determine whether a particular urban renewal or redevelopment project is desirable. The desirability of a particular urban renewal project is a political question which, by its nature, is better suited to legislative than judicial determination. Brammer, supra; Allright Missouri, Inc. v. Civic Plaza RedevelopmentCorp., 538 S.W.2d 320, 324 (Mo. 1976); City of Phoenix v.Superior Court of Maricopa County, 137 Ariz. 409, 671 P.2d 387,390-91 (1983).
We opine that the City of Birmingham did not exceed its authority in adopting Resolution 1119-81 and that the resolution was valid and lawful. The trial court's decision regarding the validity of the resolution, the judgment based on42 U.S.C. § 1983, and the award of attorney's fees under § 1988 are hereby reversed.
During the course of the trial it became apparent that the city had failed to fully respond to the plaintiff's requests for production of documents. Without advising the plaintiff or the court, and without seeking a protective order, the city *Page 469 
unilaterally decided that certain documents were privileged and withheld those and other documents which, even under its own interpretation of the request for production, should have been produced. On the plaintiff's motion for sanctions, the trial court awarded the plaintiff and its attorney $7,175.00 to compensate for attorney's fees incurred as a result of the city's failure to comply with the Alabama Rules of Civil Procedure. The order on the motion for sanctions is hereby affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR ENTRY OF AN ORDER CONSISTENT WITH THIS OPINION.
MADDOX, JONES, SHORES, BEATTY and ADAMS, JJ., concur.
TORBERT, C.J., and EMBRY, J., dissent.
ALMON, J., not sitting.
[1] Chapter 2 empowers cities to implement redevelopment projects designed:
 "(1) To acquire blighted areas, which are hereby defined as areas, including slum areas, with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, morals or welfare of the community;
 "(2) To acquire other real property for the purpose of removing, preventing or reducing blight, blighting factors or the causes of blight;
 "(3) To clear any areas acquired and install, construct or reconstruct streets, utilities and site improvements essential to the preparation of sites for uses in accordance with the redevelopment plan;
 "(4) To sell or lease land so acquired for uses in accordance with the redevelopment plan; or
 "(5) To accomplish a combination of the foregoing to carry out a redevelopment plan."
Section 24-2-2, Code of Alabama.
Chapter 3 authorizes cities to undertake urban renewal projects "for the elimination (and for the prevention of the development or spread) of slums or blighted, deteriorated or deteriorating areas." Urban renewal projects may include undertakings which would constitute a redevelopment project under Chapter 2, or any "rehabilitation or conservation work" or any combination of such projects. Section 24-3-2 (c), Code of Alabama 1975. Rehabilitation or conservation work includes:
 "(1) Carrying out plans for a program of voluntary or compulsory repair and rehabilitation of buildings or other improvements;
 "(2) Acquisition of real property and demolition, removal or rehabilitation of buildings and improvements thereon, where necessary to eliminate unhealthful, unsanitary or unsafe conditions, lessen density, reduce traffic hazards, eliminate obsolete or other uses detrimental to the public welfare, or to otherwise remove or prevent the spread of blight or deterioration or to provide land for needed public facilities;
 "(3) Installation, construction or reconstruction of streets, utilities, parks, playgrounds and other improvements necessary for carrying out the objectives of the urban renewal project; and
 "(4) The disposition, for uses in accordance with the objectives of the urban renewal project, of any property or part thereof acquired in the area of such projects; provided that such disposition shall be in the manner prescribed in Chapter 2 of this title for the disposition of property in a redevelopment project area."
Section 24-3-2 (c), Code of Alabama 1975.
[2] Since the trial court case several of the businesses located on Block 60 have moved, a portion of the block has been cleared, and new construction is currently taking place.